**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Maneer LEON et al.,
Defendants-Appellants.**

**No. 74–1034.**

United States Court of Appeals,
Sixth Circuit.

Argued June 18, 1974.

Decided April 2, 1976.

Rehearing Denied June 11, 1976.

668

Neil Fink, Michael S. Friedman, Detroit, Mich., for defendants-appellants.

Ralph B. Guy, Jr., U. S. Atty., Detroit, Mich., Laurence Leff, Atty. In Charge, U. S. Dept. of Justice, Washington, D.C., Joseph S. Davies, Jr., App. Section, Crim. Div., Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before EDWARDS, PECK and McCREE, Circuit Judges.

McCREE, Circuit Judge.

This is a direct appeal by three of five defendants who were convicted by a jury of conducting a gambling business in violation of 18 U.S.C. § 1955 and of conspiracy to conduct a gambling business in violation of 18 U.S.C. § 371. Appellants present several reasons for the reversal of their convictions: (1) the district court erred in not dismissing the indictment because § 1955 of Title 18 violates the United States Constitution; (2) the district court erred in not dismissing the conspiracy count of the indictment because charging a conspiracy as well as a substantive offense requiring concerted action violates "Wharton's Rule"; (3) the district court erred in refusing to instruct the jury that the government must prove that each defendant knew that five or more persons were involved in conducting the gambling business in order to convict that defendant of either the substantive crime or of the conspiracy to commit it; (4) the district court erred in denying the motion to suppress evidence seized pursuant to a telephone interception because probable cause to believe the subject of interception was engaged in the commission of a federal crime was not established; (5) the district court erred in denying motions for acquittal because the evidence was insufficient for submission to the jury or to support the convictions because the proofs failed to show that appellants were conducting a gambling business involving five or more persons and to show that appellant Bourgeois was a participant in the gambling business conducted by Leon and Miller, and not merely an independent bookmaker; (6) the district court erred in restricting Bourgeois' cross-examination of a witness; and (7) the district court erred in not holding that the inflammatory and prejudicial closing argument of the government attorney precluded a fair trial.

The complexity of the proofs and the number of questions presented on appeal require an extensive review of the evidence. Appellants were indicted[1] on December 5, 1972 for violation of 18 U.S.C. § 1955[2] and for violation of 18 U.S.C. § 371 for conspiring to violate 18 U.S.C. § 1955. Following a lengthy trial by jury, all three were convicted of conspiracy and of the substantive offense of conducting, financing, managing, supervising, directing or owning a gambling business from March 1, 1972 to May 7, 1972, that was in violation of the laws of Michigan, involved five or more persons, and had

1. In addition to appellants, Albert Hady, John Doyle, Edmond Burdziak, and John Jarjosa were named as conspirators and co-defendants. June Taylor, Ben Brown, Leroy Estrada, Santiago Calvez, and Reginald Ostrowski were named as unindicted conspirators. In the substantive count, Albert Hady, John Doyle, Edmond Burdziak, Leonard Silbert, Milton Largent, and John Jarjosa were named as co-defendants. Only Jarjosa and Hady were tried with appellants. After the trial had concluded, the district court granted Jarjosa's motion for a mistrial. Hady did not appeal his conviction.

2. This statute provides, in relevant part:

(a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.

(b) As used in this section—

(1) "illegal gambling business" means a gambling business which—

(i) is a violation of the law of a State or political subdivision in which it is conducted;

(ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and

(iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.

(2) "gambling" includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.

(3) "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.

(c) If five or more persons conduct, finance, manage, supervise, direct, or own all or part of a gambling business and such business operates for two or more successive days, then, for the purpose of obtaining warrants for arrests, interceptions, and other searches and seizures, probable cause that the business receives gross revenue in excess of $2,000 in any single day shall be deemed to have been established.

a gross revenue of more than $2,000 on a single day.[3]

A large part of the government's proofs consisted of recorded conversations intercepted from Maneer Leon's telephones pursuant to a judicial order entered on March 1, 1972 upon application of the Department of Justice and pursuant to an order granting an extension on March 24. The recordings included conversations about gambling between appellant Maneer Leon and appellants Vera Miller and Glenn Bourgeois, as well as between Leon and Milton Largent, Leonard Silbert, Al Hady, John Jarjosa, Edmond Burdziak, and John Doyle. Appellants concede in their brief that these recorded conversations indicate that ". . . Maneer Leon was a bookmaker, who accepted wagers in both sporting events and horse races, . . . that Vera Miller worked for Leon, accepting bets, collecting winnings, and paying off losses," and that "Glenn Bourgeois was a bookmaker."

In addition to the recorded conversations, government witnesses gave the following testimony. June Maxine Taylor testified that Maneer Leon was a bookmaker with whom she had placed daily bets of from one hundred to two hundred dollars, both on her own behalf and on behalf of her friends.

She testified that Leon told her to call in her bets to "Vera" at a telephone number shown to belong to appellant Vera Miller, and that he instructed her to accept wagers from persons whom he would refer to her, and to make an accounting to him of winnings and losses. She indicated she took wagers for the bettors referred to her by Leon and transmitted their account figures to him.

Leroy Estrada, who admitted that he was a gambler and a small-scale bookmaker, testified that during the period in question he referred bests that were too large for him to other bookmakers, including Leon. He also testified that Leon had given him Vera Miller's telephone number so that he could call bets in to her and that he sometimes received "line"[4] information from Leon and from Miller. Estrada testified that he did not tell Leon or Miller that some of the bets he placed with them were "layoff" bets[5] and that, accordingly, he had to pay "juice"[6] to them if he lost. Estrada therefore bet with Leon for himself as well as for other people, and he testified that he shopped for a favorable line in an attempt not only to win the bet made with him but also to win the bet that he made with his own bookmaker.

---

3. Appellant Leon was sentenced to one year of imprisonment and fined $7,500 on the conspiracy count, and was sentenced to one year of imprisonment on the substantive count. Appellant Miller received a suspended prison sentence and was placed on probation for two years and ordered to pay a fine of $2,000. Bourgeois' imprisonment sentence was also suspended, and he was placed on probation for two years and fined $7,000.

4. Estrada testified regarding the meaning of several gambling terms. He stated that the term "line" refers to the point spread or odds on a sporting event and that a "line" is quoted to a prospective bettor so that he can determine whether he wishes to place a bet and, if so, on which team. Estrada testified that he got his line by calling a number of other bookmakers, but that if he believed that the line he received did not correctly assess the relative strengths of the teams involved, he might "move the line around," changing the point spread or odds. A line may also be obtained from newspapers. Estrada stated that he had obtained his line from newspapers on occasion,

but that newspaper predictions become unreliable when, for example, a key player is injured just before a game.

5. According to Estrada, a "layoff" bet occurs when a bookmaker accepts a bet and then rebets the money with another bookmaker. Although he stated that he never used the term in his business, he informed the jury that it was his practice to "give away" or "layoff" approximately 20 to 30 percent of the bets he received.

6. Estrada explained the term "juice" or "vigorish" as a device used by bookmakers to attempt to insure that they will make a profit in the long run even if they lose as many bets as they win. Usually bookmakers require a bettor to wager $1.10 to win $1.00, in effect requiring a bettor to lay odds of 11 to 10. "Juice" is not collected on winning bets. For example, if a person bets $100 on a team and the team loses, he is obliged to pay $110 to the bookmaker; if the team wins, however, the bettor receives only $100.

Helen Alongi, a barmaid at a local establishment, testified that Bourgeois was a customer there, and that, in response to his request, she had given him a key to her home and permission to use it from time to time. The parties stipulated that one of the telephone numbers from which Leon had called Bourgeois was listed to Mrs. Alongi's address. In addition, Mrs. Alongi testified that on several occasions she had given envelopes to Glenn Bourgeois that had been left for him at the bar. She stated that this service was not unusual, and that people often gave her messages, numbers, and envelopes to transmit to others.

John Laffrey, a bettor, testified that he and Al Hady, named as a co-defendant, were friends; that Hady had introduced him to Maneer Leon; and that he had placed bets with Leon, losing from $2,000 to $3,000. Laffrey stated that he had made arrangements with Leon to transfer money to him through Hady, and that he had suggested to Hady that the latter deliver money to Leon for him.

Al Hady, who was accused of being a "collector" for Leon and who testified on his own behalf, stated that he was a salesman for a wine and liquor company, that he knew Laffrey well because his wife worked for Laffrey, and that he had delivered an envelope of money to Leon for Laffrey at the latter's request. He denied that he worked for Leon and that he ever picked up any other money for him. Hady admitted that he placed bets for himself with Leon but denied that he ever placed bets for other people.

Recorded conversations between Hady and Leon indicated, however, that Hady was making bets with Leon for others. Hady explained that he wanted Leon to think that he was making bets for other people because he and Leon were friends, and he would have felt bad taking money from Leon for his winnings if Leon had known that the bets were Hady's.

Recorded conversations between Leon and co-defendant John Jarjosa were also introduced. These conversations suggest that Jarjosa was betting with Leon both for himself and for others, and that Jarjosa owed Leon a large amount of money which Leon was attempting to collect in installments. Testifying on his own behalf, Jarjosa admitted that he was a long-time gambler and stated that he owed so much money to Leon in 1972 that Leon refused to accept any more bets until his debt was paid. Accordingly, Jarjosa testified that he had invented a fictitious third person in whose name he could make bets. He testified that his statements in the recorded conversations about receiving bets that he wanted to layoff to Leon were fabrications to persuade Leon to accept his bets.

Telephone conversations between Leon and Edmond Burdziak, a named defendant who was not tried with appellants, were also introduced. These conversations indicate that Burdziak bet with Leon either in his own capacity or as a representative of a group of bettors, or that Burdziak wrote bets on behalf of Leon.

Telephone calls between Leon and Leonard Silbert, a named defendant (who was not tried with appellants), indicated that Leon gave line information to Silbert, Silbert bet with Leon, and that Leon gave Silbert his "bottom figure," [7] the amount owed by one to the other for bets previously made.

Telephone conversations between Leon and John Doyle disclosed that Leon supplied line information to Doyle, that Doyle bet with Leon, and that Doyle was indebted to Leon.

Telephone calls between Maneer Leon and Milton Largent, a bookmaker and a named defendant not tried with appellants, were also introduced. In these conversations, Leon and Largent discussed their respective winnings and losses, exchanged line information, made bets with one another, and discussed their respective indebted-

---

**7.** Betting transactions are customarily on credit, and the bettor and the bookmaker meet, perhaps once a week, to "settle up" on the

"figures," a term that refers to the amount of money owed by one to the other.

ness to each other. Other evidence disclosed that Leon and Largent met at least three times during the time that Leon's telephone was being tapped, once at Leon's house and twice at a bar.

The government also played for the jury fifteen telephone conversations between Glenn Bourgeois and Maneer Leon. It is admitted, as the calls convincingly demonstrate, that Bourgeois was a bookmaker. In these conversations, all except one of them made by Leon to Bourgeois, they discussed their bookmaking activities, exchanged line information, and placed bets with each other on various sporting events.

A special agent of the Federal Bureau of Investigation, who had been in charge of the investigation, testified throughout the trial, identifying the voices in the recordings and, to a certain extent, interpreting gambling terminology although the government did not formally qualify him as an expert in the activity of gambling. When asked if he could determine whether the bets placed by Leon with Bourgeois were personal bets or layoff bets he answered that he could not, and he indicated that he had not made any effort to examine the recordings carefully in order to find whether bets made by Leon with Bourgeois corresponded to earlier bets that he had accepted from others. He stated that it might not be possible to trace the bets made by Leon with Bourgeois because he could not account for all the bets received by Leon. He acknowledged, however, that Leon could have been betting with Bourgeois for any number of reasons including what he termed "reinsurance" or layoffs.

Special Agent R. Phillip Harker, who was qualified as an expert in the area of gambling, testified that in addition to merely transferring to another bookmaker the responsibility for paying off a possible losing bet, a bookmaker might bet with other bookmakers in an effort to achieve an absolute balance between wagers for which he is responsible, so that an equal amount of money is, in effect, bet with him, on both teams in a particular game. In such a situation, he explained, the bookmaker may win nothing but he will lose nothing, and he may at least obtain the "juice" on bets he collects, or at least on that portion of the betting on which he has not made corresponding wagers with other bookmakers thereby obligating himself to pay "juice." Harker also testified that a bookmaker, anticipating heavy betting on one team in a game, might make a corresponding bet with another bookmaker in advance of receiving bets so that his books would be balanced by game time. In illustrating "anticipatory layoff wagering" Harker referred to the transcript of a conversation between Bourgeois and Leon which indicated that Bourgeois told Leon "you can buy it back on St. Louis." Harker testified that this statement indicated to him that Leon had made an anticipatory layoff wager on St. Louis, expecting on the other side of the game heavy betting that did not come about, and that Bourgeois was offering to allow Leon to withdraw the anticipatory bet. However, the recording itself disclosed that Bourgeois had actually stated "you get a dime back on St. Louis"—indicating that in their previous day's betting, Leon had won $1,000 on St. Louis.[8] Harker was unable to relate any other examples of anticipatory layoff wagering and although he had never read about such a procedure in any books, he testified that he had been told by bookmakers that such wagering was done. He refused, however, to identify any of the bookmakers who were the source of this information on the ground that they were confidential informants.

Harker concluded that the appellants and the other defendants, both those who were being tried and those who were not, constituted a "loose gambling organization." Leon and Bourgeois were independent bookmakers, who relied on each other for line information and layoffs. He testified, however, that he could find no instance in

8. Harker testified in the recorded conversations, "nickel" meant $500, "dime" meant $1,000, and "dollar" meant $100.

which Bourgeois bet with Leon,[9] and that Leon could have been betting with Bourgeois for any number of reasons including layoffs. He described Vera Miller as a writer of bets and a "subbook" for Leon; Albert Hady as a collector for Leon; Milton Largent as an independent bookmaker who relied on Leon and upon whom Leon relied for layoffs and line information; Edmond Burdziack as either a bet writer for Leon or an independent bookmaker; John Doyle as a bookmaker who accepted bets independently and also as a person who "split" some betting activity with Leon; and Leonard Silbert as a large-scale bookmaker who shared layoffs and line information with Leon. Harker was unable to determine John Jarjosa's precise place in the "organization."

Harker's analysis of the recorded conversations led him to conclude that on March 19, 1972 Leon had accepted $5,700 in wagers and had bet $3,300 himself, and that on March 12, 1972 Leon had accepted $1,125 in wagers and had bet $2,000 himself. He also testified that a telephone call of March 12, 1972 from Leon to Bourgeois revealed that $2,100 was bet.

Another agent of the Federal Bureau of Investigation testified that on December 6, 1972 he had searched Leon's residence and that while he was in the house numerous calls were received on five or six telephones located on the premises. Some of the calls requested information on basketball games. Agents seized cards containing gambling records on which Leon's fingerprints were found, about $5,000 in cash, two address books, one piece of paper bearing names and figures, nine pairs of dice, one Burroughs adding machine, one telephone head test set, and one electronic Bearcat receiver. These items were all introduced into evidence.

At the conclusion of the government's case and at the conclusion of the trial, ap-

pellants moved for a judgment of acquittal. The motions were denied. After the jury had returned its verdict, appellants filed motions for a new trial. These motions were also denied, and this appeal followed.

## I. Constitutionality of 18 U.S.C. § 1955.

■ Appellants contend that section 1955 is unconstitutional for the following reasons: (1) the statute is an intrusion by Congress into wholly intrastate activity; (2) it violates the Fifth Amendment because it is vague and applied unequally since one of the elements of the offense is a violation of state law; (3) it violates the Ninth and Tenth Amendments because it intrudes upon powers properly reserved to the states; and (4) the presumption contained in it that a gambling business, as defined in § 1955, affects interstate commerce lacks a rational connection between the fact proved and the ultimate fact presumed.

Consistent with precedent, we reject each of these constitutional objections to § 1955. We have previously held that Congress' incorporation of a violation of state gambling laws as an element of the offense in § 1955 is not an unconstitutional delegation to the states. *United States v. Palmer*, 465 F.2d 697 (6th Cir.), *cert. denied*, 409 U.S. 874, 93 S.Ct. 119, 34 L.Ed.2d 126 (1972). Further, other circuits have carefully considered and rejected the other constitutional arguments advanced by appellants. *United States v. Sacco*, 491 F.2d 995 (9th Cir. 1974) (en banc); *United States v. Hunter*, 478 F.2d 1019 (7th Cir.), *cert. denied*, 414 U.S. 857, 94 S.Ct. 162, 38 L.Ed.2d 107 (1973); *United States v. Riehl*, 460 F.2d 454 (3d Cir. 1972); *United States v. Harris*, 460 F.2d 1041 (5th Cir.), *cert. denied*, 409 U.S. 877, 93 S.Ct. 128, 34 L.Ed.2d 130 (1972); *Schneider v. United States*, 459 F.2d 540 (8th Cir.), *cert. denied*, 409 U.S. 877, 93 S.Ct. 129, 34 L.Ed.2d 131 (1972). Their conclusions are entirely consistent with the Supreme Court's approach to the commerce clause in *Perez v. United*

---

**9.** During cross-examination, defense counsel asked Harker, "Have you found any instances where Mr. Bourgeois placed a bet with Mr. Leon," and Harker replied, "Not in these transcripts where he actually placed a bet, no."

Our examination of the transcripts reveals, however, that there may have been at least one occasion where Bourgeois placed a bet with Leon.

674

*States,* 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971), where the Court rejected a similar challenge to the federal "loansharking statute, 18 U.S.C. § 891, *et seq.* (1964 ed., Supp. V). We agree with these courts and with the reasons for their decisions, and uphold § 1955.

II. Dismissal of the Conspiracy Count of the Indictment in accordance with Wharton's Rule.

 Appellants contend that the dismissal of the conspiracy count of the indictment was required under Wharton's Rule. In *Iannelli v. United States,* 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975), however, the Supreme Court rejected this argument and held that a person may be prosecuted both for a violation of 18 U.S.C. § 1955 and for a conspiracy to violate that section under 18 U.S.C. § 371. That determination controls this issue on appeal.

III. Jury Instruction.

 Appellants Bourgeois and Miller assign as error the refusal of the district court to instruct the jury that in order to convict them of conspiracy to conduct a gambling business in violation of 18 U.S.C. § 1955, or of commission of the substantive offense, they must find beyond a reasonable doubt that each defendant knew that the gambling business was conducted, financed, managed, supervised, directed or owned by five or more persons.

We conclude, however, that the district court did not err in refusing to give the requested instruction.

The "five persons" criterion of § 1955 has been held to be a jurisdictional requirement which is unrelated to the criminal character of the conduct, intended by Congress to confine federal attention to large-scale organized gambling, which has an important impact on interstate commerce, and serves as a source of income for organized crime. *United States v. Pacheco,* 489 F.2d 554 (5th Cir. 1974), *reh. denied,* 491 F.2d 1272, *cert. denied,* 421 U.S. 909, 95 S.Ct. 1558, 43 L.Ed.2d 774 (1975); *United States v. Iannelli,* 477 F.2d 999 (3rd Cir. 1973), *aff'd,* 420

U.S. 770, 789–790, 95 S.Ct. 1284, 1295–1296, 43 L.Ed.2d 616, 629–630 (1975). Therefore the jury need not find that each defendant convicted of the *substantive offense* had knowledge of this jurisdictional element in order to convict. *United States v. Brick,* 502 F.2d 219, 224 (8th Cir. 1974); *United States v. Marrifield,* 515 F.2d 877, 883 n. 10 (5th Cir. 1975); *United States v. Iannelli,* 477 F.2d 999, 1002 (3rd Cir. 1973), *aff'd other grounds,* 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975).

We also hold that in the case of a *conspiracy* conviction, it is not essential to show that any defendant knew that the gambling business would involve five or more persons. We are aware that at least one circuit has held that a defendant must be shown to have agreed to take part in a gambling business that he knew would involve five or more persons in order for a conviction for violation of § 1955 to stand. *United States v. Pepe,* 512 F.2d 1129, 1131–1132 (3d Cir. 1975). However, we do not agree with this decision, and the Third Circuit itself has now repudiated its rationale. *United States v. Johnson,* 514 F.2d 431, 432 (3d Cir. 1975); *United States v. Starks,* 515 F.2d 112, 124 (3d Cir. 1975). *Pepe* was based upon *United States v. Alsondo,* 486 F.2d 1339, 1343 (2d Cir. 1973), which has since been reversed by the Supreme Court *sub nom., United States v. Feola,* 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975).

*Feola* states the controlling law on the issue whether specific knowledge of federal jurisdictional facts is necessary for a conspiracy conviction when not necessary for conviction of the related substantive offense. In *Feola,* the Supreme Court held that neither the general federal conspiracy statute, 18 U.S.C. § 371, nor the Court's prior decisions established a general rule requiring a showing of a greater degree of criminal intent to convict for conspiracy than to convict for the related substantive offense. Knowledge that the victim was a federal officer was not required for conviction of the substantive offense of assaulting a federal officer. Therefore, more specific

knowledge should be required to support a conspiracy conviction only if the policies underlying conspiracy necessitated this result. The Court focused on the protection of society as the primary policy underlying conspiracy law, holding that the danger to society was the same regardless whether the defendant knew that the victim of his assault was a federal officer. The second policy of the law of conspiracy was that once criminal intent has crystallized and some action has been taken pursuant to this intent, the likelihood of the commission of the completed crime warrants immediate preventive government intervention. In the case of assault on a federal officer, once the agreement to assault the officer has been reached, and some action taken in furtherance of the plan, the Court found that the purpose of the conspiracy laws would not be served by requiring that the conspirator be aware of his intended victim's status as a federal officer before the government could intervene to prevent the crime. Therefore, knowledge of the jurisdictional fact that the intended victim was a federal officer was not an element of conspiracy to assault a federal officer.

Applying the rationale of the *Feola* case to the statute before us, we reach a similar conclusion. The special purposes underlying the imposition of criminal liability for conspiracy, as well as for the substantive offenses, require no greater specific knowledge for conspiracy to violate § 1955's prohibitions than for the substantive offense prohibited by § 1955. Like the Court in *Feola,* we find that the danger to society does not differ depending upon whether the defendant was specifically aware of the fact that five or more persons would be involved in the illegal gambling enterprise he agreed to join. Nor does focusing upon the right of society to take preventive action once criminal intent has crystallized and some action has been taken toward the illegal goal justify distinguishing between a defendant who knew that the gambling enterprise in question would be operated by five or more persons, and one who was ignorant of this specific fact.

IV. Motion to Suppress.

■ Appellants urge that the district court erred in denying a motion to suppress evidence of telephone communications intercepted in accordance with 18 U.S.C. § 2518 because the application for authorization of this interception and the affidavits submitted in support of the application do not demonstrate probable cause to believe that Leon was committing a federal crime. We conclude, however, after examination of the challenged affidavits, that there was probable cause to believe that Leon was an integral participant in a gambling business violative of the laws of Michigan, involving at least four other persons, and receiving more than $2,000 in gross revenues in a day.

Briefly, the affidavits contained an assertion by a confidential informant shown to be reliable that Leon had disclosed that he had made over $200,000 from his football gambling operation alone during the 1971 season, and an admission that the informant was heavily in debt to Leon because of his own betting activity. Earlier judicially authorized wiretaps disclosed that Leon exchanged extensive line information with one George Tamer and other persons. Leon's disclosure to the informant of the profitability of his football operation, the informant's assertion that he had placed bets with Leon, and the exchange of extensive line information furnished the probable cause required to obtain a warrant to intercept Leon's telephone communications. *See United States v. Ceraso,* 467 F.2d 653, 656 (3d Cir. 1972) where the court held that giving line information and accepting bets are acts "clearly within the concept of conducting a bookmaking operation." *See also United States v. Williams,* 459 F.2d 909 (6th Cir. 1972).

V. Insufficiency of Evidence.

Appellants Leon and Miller contend that the proofs did not establish that the gambling business that they conducted involved five or more persons who conducted, financed, managed, supervised, directed, or owned all or part of such business. Appel-

lant Bourgeois contends that there was insufficient evidence to show that he was a participant in the gambling business run by Leon and Miller but that, on the contrary, the evidence showed that he was an independent bookmaker who accepted bets from Leon and who also made bets with him.

When Congress enacted § 1955, it intended to exclude only bettors from liability for their participation in an illegal gambling business conducted by five or more persons, and with the exception of bettors, the term "conduct" was intended to mean "any participation in the operation of a gambling business." *United States v. Ceraso,* 467 F.2d 653, 656 (3d Cir. 1972). *See also United States v. Mattucci,* 502 F.2d 883, 888 (6th Cir. 1974); *United States v. Becker,* 461 F.2d 230, 232 (2d Cir. 1972), *vacated on other grounds,* 417 U.S. 903, 94 S.Ct. 2597, 41 L.Ed.2d 208 (1975); *United States v. Riehl,* 460 F.2d 454, 459 (3d Cir. 1972); *United States v. Harris,* 460 F.2d 1041, 1049–1050 (5th Cir.), *cert. denied,* 409 U.S. 877, 93 S.Ct. 128, 34 L.Ed.2d 130 (1972). Thus, the House Report accompanying the bill that eventually became 18 U.S.C. §§ 1511 & 1955, explained:

> The term "conducts" refers to both high level bosses and street level employees. It does not include the player in an illegal game of chance, nor the person who participates in an illegal gambling activity by placing a bet. 1970 Cong. & Admin. News, p. 4029.

Accordingly, the court in *United States v. Hunter,* 478 F.2d 1019 (7th Cir.), *cert. denied,* 414 U.S. 857, 94 S.Ct. 162, 38 L.Ed.2d 107 (1973), rejected the argument that runners, telephone clerks, salesmen, and watchmen may not be counted to achieve the required five persons. And, the court in *United States v. Harris,* 460 F.2d 1041 (5th Cir.), *cert. denied,* 409 U.S. 877, 93 S.Ct. 128, 34 L.Ed.2d 130 (1972) held that dealers as well as doormen were persons who conduct an illegal gambling business. At the same time, however, the participants in a gambling business must have some concert of purpose. As the court observed in *United States v. Hunter,* 478 F.2d 1022,

[a]lthough . . . the three businesses [three kinds of lottery tickets each managed by a different person] are readily identifiable as separate commercial ventures, we are satisfied that the three entrepreneurs had a sufficient common interest in the development of sales, the maintenance of security, the efficient performance of services, and the solvency of all three ventures [which were maintained at the same premises], to make it proper to regard them as a single criminal enterprise for purposes of the statutes here involved.

In determining whether there was sufficient evidence to permit the case to be submitted to the jury and to support the verdict of guilty rendered, we view the evidence in the light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

With respect to appellants Leon and Miller, the proofs were sufficient to show that the gambling business that they conducted involved more than three other persons who were also operators of the business. June Taylor testified that she accepted bets from customers including persons referred to her by Leon; that she transmitted these wagers to Leon and to Miller; and that she kept an accounting of these customers' "figures" for Leon. Leroy Estrada testified that he transmitted wagers to Leon and to Miller at the former's suggestion. Recorded telephone conversations between Al Hady and Leon, and between Edmond Burdziak and Leon, indicate that Hady and Burdziak accepted bets from other persons and relayed them to Leon. These proofs were only part of the evidence submitted to the jury relevant to the question whether five or more persons were involved in conducting the gambling business headed by Leon, and, considering them in the light most favorable to the government, we determine that they were sufficient to permit submission of the case against Leon and Miller to the jury and to sustain the verdict of guilty that it returned.

■ Although Bourgeois concedes that he was a bookmaker, his conviction must be reversed unless the government established that he was a conductor of the business operated by Miller and Leon. The only evidence presented at trial that connected Leon and Bourgeois were the recordings of their telephone conversations, and the only evidence contained in them relevant to the precise question we consider was an exchange of "line" information and the making of bets with each other. Usually, Bourgeois gave his "line" on a sporting event and Leon placed a bet. Occasionally, Bourgeois placed a bet with Leon after considering the latter's "line."

The government argues that the recordings make clear that Leon was "laying off" bets with Bourgeois and that this relationship is evidence of a community of interest sufficient to permit the inference that Bourgeois was an integral participant in the Leon business. Bourgeois argues, on the other hand, that the recordings alone are subject to any number of inferences, including an inference, equally plausible to the one urged by the government, that Leon and Bourgeois merely placed personal bets with each other.

We conclude that the recordings are equally susceptible to the interpretation that appellant Bourgeois urges as they are to the interpretation for which the government contends. Accordingly, we reverse Bourgeois' conviction. After a careful examination of the recordings, we find it impossible to conclude from them that Bourgeois had an interest in the welfare of the business conducted by Leon or that Bourgeois' gambling activity was a part of the business conducted by Leon and Miller. We also observe that the government's expert witness was unable to conclude that Leon was making "layoff" bets with Bourgeois, and that he testified ·that bookmakers placed bets of their own with other bookmakers. And, in response to the question,

". . . Now as to all of these reasons why a bookmaker might make a bet with another bookmaker, as to the individual bets that Mr. Leon made with Mr. Bourgeois, it could be for any number of the reasons that you've given us; isn't that a fair statement?", Harker replied, "yes, sir." Moreover, when the defense asked the agent who had been in charge of the investigation whether he had examined the recordings and other records of Leon to determine whether the bets Leon placed with Bourgeois corresponded to any that Leon had accepted, he replied that he had not. Nor did the government make any attempt to place before the jury evidence of a connection between bets accepted by Leon and bets made by him with Bourgeois—evidence that would have permitted the inference that the bets placed with Bourgeois were more likely to have been "layoff" bets instead of personal bets.

■ Accordingly, Bourgeois' conviction must be reversed because there is no direct evidence of his guilt, and the conviction is supported *only* by *circumstantial evidence* from which one can *infer either* facts tending to prove the defendant's guilt, *or* facts tending to prove his innocence. As we held in *United States v. Saunders,* 325 F.2d 840, 843 (6th Cir. 1964), *cert. denied,* 379 U.S. 978, 85 S.Ct. 677, 13 L.Ed.2d 568 (1965),[10] a verdict of guilty cannot stand on appeal where the evidence "at most establishes no more than a choice of reasonable probabilities" or inferences, one criminal and the other innocent. *See also United States v. Delay,* 440 F.2d 566, 568 (7th Cir. 1971), where the court stated, "Where the evidence as to an element of a crime is equally consistent with a theory of innocence as with a theory of guilt, that evidence necessarily fails to establish guilt beyond a reasonable doubt." For the same reasons, we conclude that the conviction of Bourgeois for conspiring to violate 18 U.S.C. § 1955 must also be reversed. *See also United*

---

**10.** Because we determine that the evidence was insufficient to permit the case against Bourgeois to be submitted to the jury, we do not reach the question whether the district court improperly restricted cross-examination of the

witness Jarjosa. We observe, however, that in a criminal case, the accused should be afforded every reasonable opportunity to challenge testimony that tends to incriminate him and to demonstrate his innocence.

*States v. Varelli,* 407 F.2d 735, 742–743 (7th Cir. 1969), *cert. denied,* 405 U.S. 1040, 92 S.Ct. 1311, 31 L.Ed.2d 581 (1972); *United States v. Barnes,* 383 F.2d 287, 290 (6th Cir. 1967), *cert. denied,* 389 U.S. 1040, 88 S.Ct. 780, 19 L.Ed.2d 831 (1968).

## VI. Prosecutorial Misconduct.

■ Appellants charge that they were denied their constitutional right to a fair trial by the government attorney's closing argument in which he made several extended references to Congress' purpose in enacting § 1955.[11] Appellants contend that the references to legislative purpose were inflammatory and prejudicial, that they placed before the jury facts not in evidence, and that they suggested to the jury that appellants' gambling activities were precisely the kind that had caused Congress so much concern.

We begin our examination of this charge (that the government attorney prejudiced appellants' right to a fair trial) by referring to the oft-repeated and sometimes ignored statement of the Supreme Court in *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314, 1321 (1935):

11. Because we reverse the conviction of Bourgeois on the grounds of insufficiency of evidence, we do not consider his contention that he was denied his right to a fair trial both because of the government's reference to congressional intent and because the Prosecutor also asserted, in his closing argument, that Bourgeois, who did not testify, was trying to "con" the jury. Bourgeois contended that the latter assertion was improper and that it constituted an expression of personal belief in his guilt. The assertion to which Bourgeois refers was a lengthy one:

> Finally, I saved him for last because it's a rather ingenious defense. I've got to hand it to him, Glenn Bourgeois. Mr. Bourgeois is a bookmaker in his own right. As I say, he's not here for that, but that's important and I will allude to that in a minute.
> How do we know it's Mr. Bourgeois in those telephone calls? He uses his first name, never the last name, he uses his first name. Not too happy about it sometimes when Maneer uses his first name, as you see from those calls, but he uses his first name. His voice is identified by agents who are familiar with him. He is actually arrested later on that year on an indictment in one of the two places where one of the phones was located.
> Bourgeois is a clever man. He jumped around to a different phone spot immediately after that gambling raid that they talked about on the telephone. It's Glenn Bourgeois who ups and changes his phone spot. Helen Alongi comes in here and tells, us, "Well, it's Glenn Bourgeois that I let use my place." She's a little vague about when and how many times, but we know then that not only was he arrested in one spot where he used that telephone, that's that 585–3302, but Helen Alongi tells us he has been in that place, 543–2859, a place where, on 1999 Coolidge, the phone is registered to her daughter. We know it was Glenn Bourgeois in all of these telephone calls there using those two telephones, all that evidence.

> All right. What is his participation in this conspiracy, in this illegal gambling business? This is where I have to hand it to him. Glenn Bourgeois is a smart man. I saw that from the outset of this case, and I respected it all the way through here.
> But he's outsmarting himself, because he can do the same thing as some of these other people and con you, and he thinks—
> MR. FINK: I'm going to object.
> MR. ANDERSON: —and he thinks he can con you by posing a theory—
> MR. FINK: That's highly irregular. It's improper. It's not supported by the evidence, and I recognize this is argument, but it's an inflammatory argument. When did Mr. Bourgeois ever try to con anybody within the context of this trial?
> MR. ANDERSON: I said Mr. Bourgeois thinks—
> THE COURT: Well, argue it, Mr. Fink, argue it. He said he thinks he is.
> MR. ANDERSON: I said Mr. Bourgeois thinks he is.
> A VOICE: Your Honor, I've got to be excused.
> THE COURT: Let's take a five-minute recess.
> MR. ANDERSON: Sure, no problem.

These remarks were improper and highly prejudicial. See, *e. g., Harris v. United States,* 131 U.S.App.D.C. 105, 402 F.2d 656 (1968), *Steele v. United States,* 222 F.2d 628, 631 (5th Cir. 1955). Even if they are not necessarily subject to the interpretation that the prosecutor was commenting on Bourgeois' failure to testify, nevertheless, they suggested that the prosecutor had information not disclosed to the jury demonstrating Bourgeois' guilt. It is difficult to surmise what legitimate purpose reference to an accused's state of mind at trial would serve, particularly where the accused did not testify on his own behalf.

We do not speculate whether or not the remarks directed at Bourgeois also had the effect of prejudicing the jury in its determination of the guilt of the other defendants.

The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

 This principle forbids the government's injection of improper or prejudicial material that deprives an accused of his right to a fair trial. For example, the government attorney may not express to the jury his personal knowledge of the guilt of the accused, or bring to its attention purported facts that are not in evidence and are prejudicial. *Berger v. United States, supra, Viereck v. United States,* 318 U.S. 236, 63 S.Ct. 561, 87 L.Ed. 734 (1943). *Cf. Griffin v. California,* 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) which holds that the Fifth Amendment privilege against self-incrimination prohibits the government attorney from suggesting that inferences unfavorable to the accused may be drawn from his failure to testify. Not every instance of misconduct requires the reversal of a conviction, however, and when isolated remarks are made in the course of a long trial and the jury is given an appropriate cautionary instruction designed to overcome or to dissipate any prejudice that may have been caused, the error may be harmless. *See Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); *United States v. Mattucci,* 502 F.2d 883, 887 (6th Cir. 1974). In every case, we consider the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether

they were isolated or extensive; whether they were deliberately or accidentally placed before the jury, and the strength of the competent proofs introduced to establish the guilt of the accused. *See, e. g., United States v. Bowen,* 500 F.2d 41 (6th Cir. 1974), *cert. denied,* 419 U.S. 1003, 95 S.Ct. 322, 42 L.Ed.2d 278 (1975).

This circuit has condemned the practice of some government attorneys who introduce prejudicial evidence that they should know is inadmissible, or who argue to the jury about matters not properly introduced into evidence or inferable from the evidence. There have been instances where we have had to reverse convictions for prosecutorial overkill where there was sufficient evidence to go to the jury and support a conviction.

For example, in *United States v. Smith,* 500 F.2d 293 (6th Cir. 1974), we reversed, in the exercise of our supervisory authority, convictions for violation of 18 U.S.C. § 1955 and for conspiracy to violate that statute because the prosecutor stated in his closing argument, that "the jury should 'require' the defendants to present a 'reasonable explanation' of the meaning of taped wiretap evidence, other than the criminal meaning he ascribed to the conversations . . . ." 500 F.2d at 294. And in *United States v. Peak,* 498 F.2d 1337 (6th Cir. 1974), we reversed a conviction for the knowing interstate transportation of a stolen truck because the prosecutor, in his closing argument, expressed his opinion that the accused had a bad character and referred to threats and attempted bribes although no evidence of such activities had been placed before the jury. *See also United States v. Calvert,* 498 F.2d 409 (6th Cir. 1974).

In this case, the challenged statements made by the prosecutor in his closing argument are as follows:

Okay: Speaking, now, of the gambling operation, I think you heard me allude to this earlier. It's a fairly recent federal law that prohibits and makes certain kinds of gambling operations illegal. This law was passed after long and con-

siderable Congressional hearings and investigations which found, after hearing testimony of numerous persons, that gambling activities—

MR. FINK: Excuse me, Mr. Anderson. I'm going to object as to the intention of Congress. They passed a law, and to go into a lot of testimony before Congress which was given under the cloak of Congressional immunity, one-sided, it just doesn't belong in this trial, your Honor.

MR. ANDERSON: This is argument, your Honor. I think I have a right to argue the nature of the law, because I'm going to allude to these kinds of activities as determined—

THE COURT: I don't see any problem with this, Mr. Fink. You can argue the opposite if you wish.

MR. ANDERSON: As I was indicating, after these extensive hearings by Congress, the federal gambling statute, Section 1955 of the Federal Code, was passed, and it was passed because Congress found that large-scale, sophisticated gambling organizations were a drain on the public resources. They found that these kind of activities affected the country as a whole. They further found that the considerable income that was enjoyed by large-scale bookmakers or their employees and their associates actually financed and furthered other substantial criminal activities. In other words, they found that large-scale, and they define that in the statute large-scale gambling organizations are very harmful to the public welfare.

I think that should be obvious to you. They take money from the public treasury, they take money from the pockets of people, they take money from the inner city that is is [sic] extremely and direly needed—

MR. FINK: This is highly inflammatory and has no place. I'm going to object to it, your Honor.

THE COURT: You're going too far, now, in what Congress intended, Mr. Anderson. I think we'd better stick to what the law is right now.

MR. ANDERSON: Well, your Honor, I think I have a right to allude to the basis for Congressional findings and for showing why such gambling operations are severe, because I'm going to refer to the severity of it when I talk about each of the parts, the parts each one of these defendants played in this operation.

THE COURT: I understand, and I agree that you may do that, but when you enter into areas that Congress may have in mind apart from its relevance to the gambling statute, that is Section 1955, then and only then do I think you go further than you have to go.

MR. ANDERSON: Congress—I'll get off that point, then, your Honor. But I will state, allude to one other finding.

Congress also found that—and you hear this word talked about all through this trial, you are going to hear it some more. Congress also heard testimony and found that layoff procedures used by gambling operations were one of the most detrimental and largest draining aspects of it. They even found that in some instances there was a national layoff system. They found that layoff bookmakers, the bookmakers who take and accept layoffs from substantial gambling operations, were part and parcel of it and added to the severity, to the impact that large gambling operations have in our society.

■ The extended remarks of the prosecutor, at first permitted by the court and then made despite a ruling sustaining an objection, characterized appellants' gambling activities as part of a nationwide scheme that was causing substantial hardship to innocent persons, that was effecting the decay of our cities, and that was financing other criminal activity.

Similar references to Congressional intent have served as a basis for overturning a conviction. In *United States v. Fullmer*, 457 F.2d 447 (7th Cir. 1972), the accused, a licensed firearms dealer, was convicted of knowingly and willfully conducting a business as a firearms dealer on premises not licensed to him. His conviction was re-

versed because of statements made by the prosecutor in his closing arguments to which objections were made. These remarks are quoted in full.

> We have filed the case here under the Gun Control Act of 1968, which was passed by Congress to provide support for Federal, State and local enforcement agencies and officials in their fight against crime and violence. . . . I don't have to tell you ladies and gentlemen, what is happening today in our country with people—not the man who shoots his wife or that kind—but people who are using ammunition and guns for sniping and creating disturbances, and so forth. 457 F.2d 449.

The court, in reversing the conviction, determined that the reference to congressional purpose and intent and the implicit characterization of Fullmer as a cause of violent activities were improper and could only have had the effect of arousing prejudice and passion. *See also Brown v. United States,* 125 U.S.App.D.C. 220, 370 F.2d 242, 246 (1966); *Traxler v. United States,* 293 F.2d 327 (5th Cir. 1961).

In the case before us, not only did the prosecutor inject inadmissible and irrelevant information into the trial but also, despite objection, the court permitted this information to be placed before the jury and informed it that the argument was proper. Moreover, the prosecutor continued his prejudicial remarks even after the court on further consideration advised him to stop, and the court did not admonish the jury to disregard the argument at the time it was made nor did the court give an appropriate cautionary instruction. Because of these occurrences and because the trial record discloses that one of the jurors stated, during *voir dire,* that he was not opposed to gambling as long as it did not hurt innocent people, we conclude that the statements were deliberately, not inadvertently, injected into the proceedings.[12]

---

12. The determination that the prosecutor deliberately injected the prejudicial material into the trial rests not only on the length and organization of his remarks but also on his attempt to discuss the same material in his opening statement and on his comments during a discussion of a post-trial motion for a mistrial. In his opening remarks the prosecutor stated:

> The indictment itself, which brings the defendants here, has essentially two counts in it. You heard a little bit about this. Now let me touch on it shortly. The first count alleges a conspiracy, a conspiracy, a planning, a setting up to violate a particular law. The second count alleges a violation of a specific substantive law itself, in this case the illegal gambling statute in the federal law.
> Now, I'll give you a little general background as to the law we're dealing with and the requirements under it and what I have to show you under it. Essentially the Congress of the United States, after extensive investigations and hearings, in the fall of 1970 passed a rather comprehensive law which became part of the criminal laws of the United States. This law is Section 1955 of Title 18, United States Code.
> Congress, during those investigations and as a basis for putting this law into effect, found that large scale gambling businesses were a drain on the public and found that they were against the public welfare.
> MR. FINK: I'll object to this. I think this is totally improper, as to what Congress is finding. It's a law.

> THE COURT: I agree with that, Mr. Anderson. I don't believe the Congressional inquiry into it is relevant here.
> MR. ANDERSON: Well, yes, sir, I will try to avoid that.
> In any event, Congress passed a law which made the operation of certain gambling businesses a federal crime. . . .

The discussion among counsel and the court concerning the motion for a mistrial because of the prosecutor's closing argument and the failure of the court to correct any prejudice arising from it also makes clear that the prosecutor deliberately injected evidence of Congressional intent into the trial, and reveals that the district court did not understand that this argument was impermissible:

> THE COURT: You have a motion, I understand?
> MR. FINK: Yes.
> Comes now Glenn Bourgeois by his counsel and moves this Court for a mistrial based on Mr. Anderson's closing argument and specifically those references to the Congressional findings.
> Your Honor will recall that I objected, the original objection was overruled. You permitted him to touch upon it. I objected again. That objection was sustained, but Mr. Anderson went further to talk about Congressional findings about layoff wagers, three different references, highly prejudicial, no proof of it in the record, based on the testimony of witnesses not subject to cross examination, no way to refute it, and most of all,

In view of these conclusions, we must determine whether, in the exercise of our supervisory powers, the convictions of appellants Leon and Miller should be reversed and the cause remanded for a new trial because of the improper conduct of the prosecutor. In making this determination we consider whether on this record the misconduct can be said to be harmless. *See Berger v. United States, supra.*

inflammatory to the extent that Mr. Anderson even had to make reference to the inner city, what a drain gambling puts on the inner city, and if that wasn't a direct ploy to attempt to dissuade at least some of these jurors to turn away from the issues involved in this case and turn instead to immaterial matters, highly inflammatory matters . .

THE COURT: Well, what matters?

MR. FINK: What matters? The matters of the great inequality and injustices that exist in the inner cities of this country, and Mr. Anderson attempts to put all of that onto a bunch of gamblers.

THE COURT: What inequalities?

MR. FINK: Your Honor, if it isn't clear to everybody that injustices and inequality exist in the cities of this country, I don't intend to belabor the point. It does.

THE COURT: What inequalities? Don't give me generalities if you have a motion for mistrial. What inequalities do you make reference to in a gambling case?

MR. FINK: I make reference to the great poverty in the inner city, the joblessness in the inner city, the despair in the inner city, for millions of people, and he attempts to blame a bunch of gamblers for those inequalities in the inner city by saying to them that gambling causes the problems of the inner city, which is what he said.

THE COURT: All right.

MR. ANDERSON: Well, that's not what I said and if counsel will reflect and wants the record read back, what I said was—

\* \* \* \* \* \*

MR. ANDERSON: What I said, your Honor, was that this drains finances from the community and from the inner city, and I think that that was one of the findings of the Congressional Committee that adopted and drafted the statute, that it drained money from those who couldn't afford to lose it. I didn't say that. I could have gone that far.

Second of all, I alluded not only to that, but to the layoff system, because that's one of the issues in this case, and I have got not only the right but the obligation to tell the jury what kinds of offenses are intended and are included in this statute, and if I can't refer to that, that bars me from telling them the kinds of things that are to be included in the statute.

There's no prejudice there, there's no inflammation there.

MR. FINK: His job is to argue the facts, and if there is any law that he needs to weave into his argument, it should be the kind of law that is going to be given to the court, not based on some Congressional finding.

\* \* \* \* \* \*

MR. FRIEDMAN: Your Honor, I'd join in Mr. Fink's motion for mistrial and I'd add this one additional reason, which I think is illuminative of Mr. Anderson's motive in making those statements, especially the reference to the inner city.

During the voir dire, one of the jurors, Mr. Fisher, I believe, when asked if he had any objection to gambling said, no, he didn't, so long as it didn't force people to go on welfare.

THE COURT: Now you hit the very reason why this Court is going to deny the motions made. You hit the very reason. Each of you left Mr. Fisher on there and each of you would like to have a juror who thought gambling was quite satisfactory unless and until it hurt somebody, and those were his words, unless and until it hurt somebody. Each of you left him on.

Mr. Anderson elected to leave him on. He has a right to tell the jury just precisely what the import of the gambling statute is and why there is such a statute. He need not take a jury with prejudice against gambling statutes, no more than he need take a jury against, prejudiced against any types of abortion restriction.

He has a right to put that statute in contention, and I don't see that he did any more at all than just that. You have a right to get up and argue the contrary if you wish. If you get up, you have a right to go up there and be as inflammatory as you wish and criticize Congress all you want, because it doesn't mean that anybody sitting on that jury even accepts that gambling statute as Congress passed it. But I don't take it as anything more, what the government said, than placing that act in context, and he had to do it so far as this jury is concerned because Mr. Fisher sits right there and either has the ability to persuade another eleven or the ability to hang this jury, and he didn't say anything more than what he was entitled to say as far as this Court is concerned. He was neither inflammatory, nor was he trying to create prejudice that the very facts of this case haven't created.

\* \* \* \* \* \*

Although we have concluded that there was sufficient evidence, viewed in the light most favorable to the government, to permit the case against Leon and Miller to be submitted to the jury and to sustain the verdicts of guilty, the evidence was not overwhelming and was so esoteric that much of it required expert interpretation and explanation. Also, there were crucial disputed questions of fact relevant to the issue whether there were three additional participants in the gambling business conducted by the principals, and the jury deliberated two days before returning the verdicts.

The evidence does demonstrate clearly that Taylor was a participant in the business and possessed an interest sufficient to permit the conclusion that she was a conductor of that business. The evidence also demonstrates that Estrada transmitted lay-off wagers to Leon and Miller and was, accordingly, also a conductor.

The evidence submitted with respect to the interest and participation of the other alleged conductors of the business is not, however, as strong. The evidence against Burdziak, Doyle, Largent, and Silbert consists of recordings of their telephone conversations with Leon in which their gambling winnings and losses were discussed, line information was exchanged, and bets were made. These conversations are subject to several interpretations, including an interpretation that these four persons were merely placing bets with Leon for themselves as customers, or an interpretation that they were exchanging bets with Leon in a gambling relationship distinct from the business run by Leon and Miller. Moreover, if the testimony given by Al Hady and John Laffrey were believed, Al Hady could not be considered a participant in the Leon-Miller operations. *See United States v. Donaway,* 447 F.2d 940 (9th Cir. 1971). And, finally, if the jury had believed the testimony of John Jarjosa, a co-defendant who testified on his own behalf and who was granted a mistrial at the conclusion of the proofs, it would have determined that he was a bettor and not a conductor of the gambling business.

We are unable to conclude that the improper attempt of the prosecutor to link these appellants to a nationwide gambling syndicate destructive of cities and of homes could not have affected the jury's interpretation of the recorded conversations and its assessment of the credibility of the witnesses.

For the foregoing reasons, the judgment of guilty entered against appellant Bourgeois is reversed; and the judgments of guilty entered against appellants Miller and Leon are reversed and their cause remanded for a new trial.

EDWARDS, Circuit Judge (concurring in part and dissenting in part).

I concur in the result reached in this case in all but one respect. As to defendant Bourgeois, I respectfully disagree with the instruction to the trial court to dismiss the complaint. In my judgment the evidence available to the jury, which will presumably be again available at a new trial, was ample to allow the jury to conclude that Bourgeois supplied "line" information for appellant Leon's gambling operation and regularly accepted "lay-off" bets from Leon which Leon could not handle.

I also believe that the inferences to be drawn from the evidence (to the degree it was in conflict) were inferences for the jury and not for this court.