UNITED STATES of America,
Plaintiff–Appellee,

v.

Anthony INGRAO,
Defendant–Appellant.

No. 87–1100.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 15, 1987.

Decided April 11, 1988.

Rehearing Denied May 16, 1988.

Richard M. Lustig (argued), Southfield, Mich., for defendant-appellant.

Keith E. Corbett, Asst. U.S. Atty., Detroit, Mich., Kathleen Nesi (argued), for plaintiff-appellee.

Before MARTIN and GUY, Circuit Judges, and JOHNSTONE, District Judge.[*]

RALPH B. GUY, Jr., Circuit Judge.

Defendant, Anthony Ingrao, was convicted by a jury of theft from an interstate shipment in violation of 18 U.S.C. § 659. Specifically, Ingrao was found to have been involved in the theft of money, checks, and food stamps from an armored car driven by him on the date of the theft and owned by a company which employed him. On appeal, defendant raises four issues: (1) insufficient evidence, (2) prejudice resulting from allowing his financial records to be introduced into evidence, (3) the facts of the case do not constitute a crime under the statute, and (4) failure to prove an interstate nexus relative to the items taken in the theft. After a review of the trial record, we conclude there is no merit to

[*] Honorable Edward H. Johnstone, United States District Court, Western District of Kentucky, sitting by designation.

any of the issues raised on appeal, and affirm.

## I.

*Insufficient Evidence*

■ This was a trial in which the government proofs were all circumstantial in nature. However, this is a comment on the nature of the evidence and not its quality since "[c]ircumstantial evidence ... is intrinsically no different from testimonial evidence." *Holland v. United States,* 348 U.S. 121, 140, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954). Furthermore, there is no requirement that circumstantial evidence remove every hypothesis but guilt. *United States v. Townsend,* 796 F.2d 158, 161 (6th Cir.1986).

In reviewing a claim of insufficient evidence, whether the evidence be circumstantial or otherwise, we do so under the standard set forth in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In *Jackson,* the court stated that the relevant inquiry on appellate review was "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt." *Id.* at 319, 99 S.Ct. at 2789 (emphasis in original).

■ Ingrao was a driver for Total Armored Car. His daily responsibility was to run a designated route, pick up checks, money, and food stamps from retail outlets, make bank deposits, and return with any undeposited or otherwise undisposed of valuables. Each armored car had a two-man crew—a driver and messenger.

On the day of the robbery, Ingrao was working with a substitute messenger, Barksdale. Because they got a late start, Ingrao suggested putting rubberbands on the door which normally locked automatically, so it would not have to be unlocked again every time they stopped. This was strictly forbidden by company policy and Barksdale had never had another driver suggest this in the two and one-half years he had worked for Total. Since it was a legal holiday, valuables were being collect-

ed but no bank stops were made, so the pick-up total was larger than usual at the end of the day. Although it was normally the job of the messenger to make the pick-ups, at one stop Ingrao went inside instead of Barksdale, and, while inside, made a telephone call. Later in the day, Barksdale talked to the dispatcher who offered more help, but Ingrao refused this offer. During the course of the day, it was necessary to buy gasoline, and company policy required that the odometer reading be logged. The odometer was logged in at 66,619 miles.

It was dark by the time Ingrao and Barksdale reached their last stop of the day at the Hostess Bakery. When Barksdale started into the store, he was told by Ingrao that the store personnel always gave them cupcakes and to be sure to get some. Barksdale then suggested that Ingrao go inside instead since he knew the people, but Ingrao declined. Barksdale stayed in the store for seven or eight minutes and, when he came out, Ingrao and the truck were gone.

One and one-half hours later, the truck was found by police with Ingrao handcuffed to the steering wheel. Each of his wrists were manacled with a separate set of handcuffs.

Ingrao's explanation of what occurred was recorded by the police and played for the jury at trial. He stated that while he was parked outside of the Hostess Bakery, the unlocked side door of the car suddenly opened and someone jumped in and told the defendant to do as he was told or "his brains would be blown out." Ingrao was unable to describe the man other than that he looked "ugly." Ingrao did not know if the man was wearing a mask and did not remember seeing a gun. Ingrao's own gun was never taken from him and was still in its holster when he was found by police.

Ingrao claims to have been directed to drive down an expressway to the rear of a building off the expressway. He was allegedly told to get out of the truck and then later to get back in, at which time was handcuffed. He stated he heard a second voice but saw no one because he kept his

eyes closed at all times. Approximately five or ten minutes after he was handcuffed, Ingrao started blowing the horn to attract attention, notwithstanding the fact that he was handcuffed in a manner that would have allowed him to still drive the truck. In the interim the armored truck had, of course, been reported as missing to the police.

Although the truck was missing for one and one-half hours, Ingrao's version of his "kidnapping" only accounted for seventeen minutes of this time. Additionally, the odometer showed 42.9 miles more than that accounted for by the route driven by defendant. Related to this is the fact that a witness saw a Total Armored Car in another part of the city near where defendant owned a building and during the time span that Ingrao's truck was missing. No Total Cars were supposed to be in that area at that time. The distance from the Hostess Bakery to the area of defendant's building and back to where the truck was found roughly equals the unaccounted for 42.9 miles.

At trial, defendant called a psychologist who testified that, in his opinion, defendant's taped version of the robbery indicated a person under stress. The jury, however, was free to conclude otherwise or to conclude that the stress was induced by his staging of a fake robbery. A rational trier of fact could well hear the tape recording of defendant's statement and find that he was avoiding meaningful responses to relevant questions being asked by the police.

In addition to the events described above, the jury also learned that although defendant had been unable to pay an ex-partner for his share of a real estate transaction, his bank deposits had increased from $580.00 to $174,519.52.

In the face of this entangling web of circumstances, defendant argues that this case should be controlled by *United States v. Leon*, 534 F.2d 667 (6th Cir.1976), where we discussed evidence that "at most establishes no more than a choice of reasonable probabilities or inferences, one criminal and the other innocent." *Id.* at 668. Although defendant accurately states the holding of

*Leon*, he fails completely to present a fact situation that parallels that in *Leon*. Here the jury had evidence as to motive, opportunity, a very weak alibi, unexplained physical facts, and unexplained sudden wealth. The cumulative evidence was more than ample to support their guilty verdict.

## II.

### The Admission into Evidence of Defendant's Financial Records

■ Defendant had invested with another person in a piece of business property. In 1981, Ingrao's co-investor deeded over his interest in the property in return for a promissory note on which payments were to begin in 1985. No money was ever paid on the note. These facts were made known to the jury as were the records of defendant's bank account covering the period December 17, 1980, through August 13, 1982. These records were introduced over defendant's objections that the evidence was more prejudicial than probative. Fed.R.Evid. 403. We have consistently held that sudden unexplained wealth occurring after the commission of an offense is admissible evidence. *United States v. O'Neal*, 496 F.2d 368, 370–71 (6th Cir.1974). We have also held that our review of Rule 403 evidentiary rulings is under an abuse of discretion standard. *United States v. Zipken*, 729 F.2d 384, 389 (6th Cir.1984). Although it is true, as defendant contends, that the government did not show that defendant was impecunious prior to the robbery, this is a factor that, under these circumstances, goes to the weight and not the admissibility of the evidence. We find no abuse of discretion on the part of the court in admitting the bank records. *See United States v. Vannerson*, 786 F.2d 221 (6th Cir.), *cert. denied*, 476 U.S. 1123, 106 S.Ct. 1991, 90 L.Ed.2d 672 (1986).

## III.

### The Scope of 18 U.S.C. § 659

18 U.S.C. § 659 applies to several types of offenders, including:

Whoever embezzles, steals, or unlawfully takes, carries away, or by fraud or

deception obtains from any ... motor-truck, or other vehicle ... with intent to convert to his own use any goods or chattels moving as or which are a part of or which constitute an interstate or foreign shipment of freight, express, or other property....

Defendant makes the argument here, as he did in his motion for acquittal, that money, checks, and food stamps are not "goods or chattels" within the purview of section 659. The district court interpreted the statute in a manner that would include the robbery of an armored truck as occurred here. We review statutory interpretations *de novo* since they present issues of law. *In re Arnett,* 731 F.2d 358 (6th Cir.1984).

Defendant premises his statutory argument on two propositions. First, the statute does not specifically mention "money" in paragraph one of section 659 under which defendant was indicted, but does mention "money" in paragraph four which deals generally with obtaining "money, baggage, goods, or chattels" fraudulently from a common carrier or a passenger thereon. Second, defendant argues that "goods" are defined in the Uniform Commercial Code in a manner that excludes money and "other things in action." *See* U.C.C. § 2–105(1) (1972).

■ As to defendant's first argument, we find it flawed because even assuming, *arguendo,* that the statute does not apply to the theft of "money," it does not resolve the issue as to checks and food stamps. Defendant in fact concedes food stamps would fall within the general definition of chattels but argues that if Congress had intended section 659 to cover food stamps, it would have amended section 659 to specifically so state. When properly analyzed, this argument is more helpful to the government than to the defendant. The very purpose of using a term like "goods or chattels" which covers the full range of

personal property is to *avoid* having to constantly amend the statute to specifically enumerate separate and distinct goods or chattels. Under defendant's analysis, the items of most obvious value and, thus, most likely to be the target of theft from an interstate shipment would be removed from the purview of the statute. Congress surely did not intend such a result.[1]

Defendant's Uniform Commercial Code argument is also deficient in several respects. First, it deals only with the term "goods" and does not address "chattels." It also leaves the matter of food stamps to be addressed by the same faulty argument described above, i.e., Congress should have amended section 659. No one has seriously contended that the items stolen should be deemed "goods" as opposed to "chattels" and so defendant really attacks a straw man with this argument. As we stated in *United States v. Shackelford,* 777 F.2d 1141 (6th Cir.1985), *cert. denied sub nom. Brooks v. United States,* 476 U.S. 1119, 106 S.Ct. 1981, 90 L.Ed.2d 663 (1986):

> By using broad language, [in section 659] Congress intended to protect the free movement of goods in interstate commerce without reliance on narrow common law definitions....

777 F.2d at 1144.

## IV.

*The Interstate Nexus*

At the time of trial, defendant entered into the following stipulation with the government:

> [T]hat the food stamps referred to in the indictment were turned over by various grocery stores to the Total Armored Car as part of the regular deposit which also included cash and checks for delivery to various Detroit banks. And when the food stamps were delivered to the local banks, they would eventually be pro-

---

1. We note also that we have upheld a conviction under this statute which involved a theft of money from a Wells Fargo truck. *United States v. Kalsbeck,* 625 F.2d 123 (6th Cir.), *cert. denied,* 449 U.S. 904, 101 S.Ct. 278, 66 L.Ed.2d 135 (1980). The statute has also been applied in other circuits to the theft of negotiable instru-

ments. *See United States v. Taylor,* 802 F.2d 1108, 1114–15 (9th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1309, 94 L.Ed.2d 164 (1987); *and United States v. Jackson,* 576 F.2d 749, 756 (8th Cir.), *cert. denied,* 439 U.S. 828, 99 S.Ct. 175, 58 L.Ed.2d 167 (1978).

cessed to the Federal reserve bank in Chicago, Illinois, and sent to the Department of Agriculture Clearing House in Minnesota.

It was also stipulated that the amount of money, checks, and food stamps alleged in the indictment were equal to the amounts reported missing.

█ In the face of these stipulations, defendant argues that there was no proof that the *defendant* "caused either the food stamps, or the money to be transported interstate." The answer to this argument is found in the language of the statute itself. Section 659 does not require that a defendant initiate or otherwise cause an interstate movement but, rather, that the "chattels [be] moving as or ... a part of an interstate or foreign shipment." Thus, although defendant's argument is factually correct, it is without legal significance.

Defendant also relies on the cases of *Lowery v. United States*, 271 F. 946 (7th Cir.1921), and *Coe v. Town of Errol*, 116 U.S. 517, 6 S.Ct. 475, 29 L.Ed. 715 (1886). *Lowery* is distinguishable as involving an *intrastate* shipment rather than an interstate shipment. *Coe* stands for the proposition that goods intended to be delivered out of state are still taxable in the state of origin, even though the goods have been delivered to a depot, because the owner could still change his mind and sell the goods within the state of origin. Aside from the obvious fact that *Coe* involves the right to tax, and not a criminal prosecution, it is also distinguishable in that the method for processing food stamps is predetermined and the stamps were not in the hands of an "owner" who could change his mind.

We conclude that the stipulation voluntarily entered into by the parties sufficiently provided the requisite interstate nexus.

AFFIRMED.