NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0251n.06

Nos. 08-5583/08-5584

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
**Apr 20, 2011**
LEONARD GREEN, Clerk

WILLIAM LEWIS HOUSTON,                          )
                                                )
          Petitioner-Appellee/Cross-Appellant,  )
                                                )
     v.                                         )
                                                )
ROBERT WALLER, Warden,                          )
                                                )
          Respondent-Appellant/Cross-Appellee.  )

**ON APPEAL** FROM THE
UNITED STATES DISTRICT
COURT FOR THE MIDDLE
DISTRICT OF TENNESSEE

**O P I N I O N**

---

**BEFORE: NORRIS, ROGERS and WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** Warden Robert Waller appeals the district court's

grant of a writ of habeas corpus to petitioner William Houston based on a violation of Houston's due

process rights under *Brady v. Maryland*, 373 U.S. 83 (1963). Houston cross-appeals, arguing that

a second ground for habeas relief, premised on ineffective assistance of counsel, was erroneously

rejected by the district court. We **AFFIRM** the district court's grant of habeas relief on Houston's

*Brady* claim.

**I.**

**A. Houston's Arrest, Conviction, and Direct Appeal in State Court**

Houston was convicted in state court of selling cocaine in various amounts on six occasions,

facilitating the sale of cocaine on one occasion, selling counterfeit cocaine on one occasion, and

aggravated assault. The events leading to these convictions took place between February and May

1997. The drug purchases were made by Ted Watkins, a paid undercover agent, and monitored by

Officer Dan Miller ("Miller") of the Giles County Sheriff's Department, and Agent Pat Howell ("Howell") of the Tennessee Bureau of Investigation ("TBI"). Both Miller and Howell testified at Houston's trial in April, 1999. Houston received a sentence of seventy-two years.

On direct appeal, Houston argued error on various grounds unrelated to the instant *Brady* claim. On December 7, 2000, the Court of Criminal Appeals of Tennessee affirmed Houston's conviction, but reduced his sentence to forty-six years. The Supreme Court of Tennessee denied Houston permission to appeal on May 8, 2001.

## B.  Howell Reveals His Cocaine Use

TBI agent Howell had worked for the TBI from February 16, 1989 until April 9, 1998, and again from November 2000, to September 18, 2001. Howell was the case agent on Houston's case, meaning he was in charge of the case and it was "his responsibility to organize the case, organize any actions that take place in that case, keep a case file, and prepare the case for prosecution." Howell also would help fill in portions of the transcribed recordings from the wires that the confidential informant wore that were unintelligible. Over a two-month period beginning in February 1997, Howell supervised the controlled buys from Houston, took possession of the cocaine after the buys, and was responsible for submitting the cocaine to the TBI. In five of the six buys, the amount of cocaine submitted to the TBI evidence lab was less than the amount agreed on for the buy. In the sixth and final buy, Howell determined, based presumably on experience of one sort or another, that the substance the confidential informant had received was not cocaine, and Howell returned to Houston's home posing as an associate of the confidential informant and demanded his money back.

When confronted by Howell, Houston drew a gun on him. In response, Howell drew his own firearm and Houston fled into the house. This incident was the basis for the aggravated assault charge against Houston.

On September 15, 2001, Howell called Roy Copeland, an officer with the TBI Drug Investigation Division, and informed Copeland that he had been using cocaine. Copeland informed others at the TBI of what Howell had told him, and Howell was put on leave pending an investigation. Howell subsequently resigned.

Howell has given conflicting accounts of when he began using cocaine and how frequently he used it. In the course of a TBI investigation into Howell's conduct, Howell admitted that he had been dealing with depression for several years; that he had been hospitalized in Arizona for his drug use during the time period between 1998 and 1999 in which he was not employed by the TBI; that he had a psychological dependency on cocaine; that he used an escort service on more than one occasion for sex; that he had on a couple of occasions used cocaine with women from the escort service; and that he had taken cocaine from drug purchases that he had made while working for the TBI, prior to their submission to the TBI, as well as from cocaine he had checked out from the TBI Crime Laboratory for "reverse" operations, in which he would act as an undercover drug dealer. The occasions where Howell obtained cocaine from amounts checked out from the TBI included at least once in 1997 or 1998[1], and once that produced the cocaine he had in his possession the night he

_____

[1]An agent who had been working with Howell on a separate investigation stated in a report that on August 6, 1997, the quantity of cocaine Howell delivered to the agent was 13.3 grams less than the quantity for which Howell had paid the target. In a statement, Howell also admitted that he

called agent Copeland.[2] The TBI investigation only reviewed the evidence in cases that Howell had worked on since his return to the TBI in 2000. That review showed that in six instances in the 21-month period preceding his confession, Howell delivered to the TBI a lesser amount of cocaine than that for which he had paid.

In a sworn statement to the TBI, Howell stated that he first started using cocaine in 1998 while undercover, taking cocaine both from an undercover buy and from cocaine checked out for an undercover operation. Howell stated that the next time he used cocaine was in July 2000, obtaining "small amounts" of cocaine from purchases he would make, and that he did this three to four times over a six-month period. Howell stated that at the beginning of 2001, he went for about ten weeks without using cocaine, and then started using cocaine again approximately twice a week. Howell recalled some of the specific cases in which he removed cocaine from buys, sometimes replacing the amount with baking soda. Howell admitted that once in May or June of 2001, he used his own money to purchase cocaine through a confidential informant, who was under the impression that it was a "controlled buy." On another occasion, Howell purchased cocaine using his own money from an individual who was under investigation.

took amounts of cocaine from evidence checked out of the TBI lab "right before I left the bureau in 1998." TBI Evidence Lab records show that Howell checked out kilograms of cocaine from the Lab on September 4 and 15, 1997.

[2]This is presumably the same amount that Howell admitted to obtaining on the occasion he checked out drugs for a reverse operation on September 10, 2001. On that occasion, he admitted to taking approximately 10 grams of cocaine from the original amount, and made up for the lost weight with extra duct tape around the package. The TBI confirmed that 7.7 grams of cocaine was missing from the package.

On October 19, 2001, Howell was indicted on four counts of tampering with evidence, and one count of possession of a controlled substance. On February 20, 2003, Howell pled guilty to two counts of tampering with evidence. During the April 21, 2003, sentencing hearing in that case, Howell took the stand. He first stated that he began using cocaine in 2000, but under cross-examination admitted that he used cocaine for the first time in 1997.[3] Howell stated that it was in part because of his cocaine usage that he left the TBI in February 1998 and returned in November 2000. During this absence, Howell attended a treatment center in Arizona, Cottonwood de Tucson, for a month of in-patient treatment. Howell testified that when he returned to the TBI, he did not inform anyone that he had a cocaine problem. Howell received a sentence of three years probation.

Howell testified at Houston's trial in April 1999, during the window of time in which he had left the TBI. Howell's cocaine use was not mentioned on direct or cross examination, or at any other point during Houston's trial or direct appeal. Howell later testified at Houston's post-conviction hearing and in the district court, as further described below.

## C. Houston's Petition for Post-Conviction Relief in State Court

---

[3]On November 10, 2003, Howell testified in a hearing on a Writ of Error *Coram Nobis* in a different case where the defendants were similarly challenging their convictions based on the subsequently revealed information that Howell, who testified against them at trial, had been using cocaine. At the hearing, Howell stated initially that he "began using cocaine in - - about a year prior to the Fall of 2001." An attorney for the defendants then directed Howell to the statement he provided to the TBI in which he stated he began using cocaine "again" in July of 2000. After additional questioning, Howell admitted that he had used "on one occasion prior to that, years before." He then admitted that the "one occasion" was "a six-week period" in late 1997.

On November 21, 2001, Houston filed a pro-se petition for post-conviction relief. The pro-se petition made four claims for relief, including a claim premised on newly discovered evidence. In the process of making his argument based on newly discovered evidence, Houston claimed, *inter alia,* "that Howell tampered with and withheld evidence favorable to Defense," "this newly discovered evidence is such that it seriously impeaches the credibility of the undercover agent who testified for the State," "neither the defendant nor his counsel had knowledge of the alleged facts (about Agent Howell) prior to trial," "[t]he trial transcript indicates defense counsel had no concrete facts that Howell was a crooked cop who tampers with evidence," and "[t]he materiality of this newly relevant evidence is such that would affect the outcome or would change the verdict in this case." Houston also cited, quoted, and discussed *State v. Singleton*, 853 S.W.2d 490, 496 (Tenn. 1993), which cites *Cagle v. Davis*, 520 F. Supp. 297, 309 (E.D. Tenn. 1980), *aff'd*, 663 F.2d 1070 (6th Cir. 1981). Houston argued that in *Singleton*, "The Court of Criminal Appeals ordered a new trial on [the] basis of newly discovered evidence seriously impeaching the credibility of the undercover agents who testified for the State." Houston also discussed the exhaustion requirement for federal habeas relief under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") and concluded: "In this regard, the petition in this case suggests that the petitioner has now presented his federal claim to the state courts for review." After the appointment of counsel, an Amendment to Petition for Post-Conviction Relief was filed, stating, *inter alia*:

3. NEWLY DISCOVERED EVIDENCE

That the TBI has an internal file with regard to TBI agent, Patrick Howells' [*sic*][,] behavior. The petitioner, William Lewis Houston, spoke with other TBI agents

regarding the behavior and statement of Patrick Howell. The petitioner, William Lewis Houston, has subpoenaed this internal file and upon receiving same will amend this petition accordingly.

Further, TBI agent, Patrick Howell, has made incriminating statements to the TBI which if known at the time of William Lewis Houston's trial would have been beneficial in his defense.

Howell testified at Houston's post-conviction hearing. Howell stated that he did not use cocaine in 1997, and that in 1998 and 1999, before Houston's trial, he was treated at a Tucson, Arizona hospital for depression. Houston admitted he was being treated for depression at the time he was working on Houston's case, but claimed he was not using cocaine at that time and did not take any drugs for his personal use from quantities purchased from Houston.

On January 13, 2003, the court dismissed the petition for post-conviction relief. As to Houston's claim based on newly discovered evidence, the court held:

> Based on the testimony of Patrick Howell, and the reports filed by the Tennessee Bureau of Investigation, the Court finds that Patrick Howell neither used cocaine, nor tampered with evidence prior to the trial of the Petitioner. The Petitioner has failed to prove by a preponderance of the evidence that Mr. Howell's post-trial conduct, which resulted in criminal charges being brought against Mr. Howell, caused any of Mr. Houston's constitutional rights to be abridged at the trial. The Court further finds that there is no newly discovered evidence that would entitle Petitioner to post-conviction relief.

**D. Houston's Appeal of the Denial of Post-Conviction Relief in the State Court**

On, September 8, 2003, Houston filed an appeal from the denial of post-conviction relief in the Court of Criminal Appeals of Tennessee. Relevant to the claim in the instant appeal, Houston argued: "Whether Newly Discovered Evidence of Officer/Witnesses' Wrong Doing and Character Mandates a New Trial." The "newly discovered evidence" argument addressed the "specific

requirements which must be met in order to grant a new trial based upon newly discovered evidence." The argument noted the centrality of Howell's testimony to the case against Houston, and that Howell had been indicted for the use or possession of cocaine. Houston identified a three-prong test under Tennessee law that must be applied in order to determine whether a new trial is appropriate on the basis of newly-discovered evidence. These prongs are that "the defendant has been reasonably diligent in obtaining the evidence, the materiality of the new evidence is apparent, and the evidence is likely to change the result." Houston argued that the first prong was met because the evidence of Howell's cocaine use did not come to light until after Houston's conviction, and "[t]herefore, no counsel in the exercise of the greatest diligence would have been able to obtain the evidence about Patrick Howell's character and his wrong doings involving cocaine." Houston next argued that the information was material because it was "not only character evidence which could have been used at trial to question the creditability [*sic*] of the TBI agent. It also goes to the real evidence that was presented at trial." In relation to the third prong, Houston argued that "the testimony of a confidential informant bolstered by a law enforcement officer who subsequently is indicted for tampering with evidence of the exact same nature [as] the evidence in the present case would mandate that a jury would not return a verdict as favorable as that of the first trial." Houston included in his brief a citation to *Cagle v. Davis*, 520 F. Supp. 297, 309 (E.D. Tenn. 1980), *aff'd*, 663 F.2d 1070 (6th Cir. 1981).

On June 16, 2004, the Court of Criminal Appeals of Tennessee affirmed the decision of the

post-conviction court. The court held that Houston was not entitled to post-conviction relief based

on the newly discovered evidence of Howell's cocaine use:

> The Tennessee Bureau of Investigation agent, Patrick Howell, was the agent in charge of Petitioner's case and handled the actions of a confidential informant. At the time of the post-conviction hearing, Agent Howell was under indictment for several counts of use or possession of cocaine, as well as[] evidence tampering for incidents during 2001. Petitioner argues that the later indictments of Howell raise questions of his credibility at petitioner's trial.
>
> Tennessee Code Annotated section 40-30-103 sets out the grounds for relief under a petition for post-conviction relief. Tennessee Code Annotated section 40-30-103 states, "[r]elief under this part shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." The discovery of newly-discovered evidence as to a witness's credibility does not fall within these parameters. This Court has stated:
>
>> It has been long established that issues concerning the sufficiency of the evidence, the guilt or innocence of the accused, and the competency or credibility of witnesses, who testified at the trial are not cognizable in post-conviction proceedings.
>
> Cole v. State, 798 S.W.2d 261 (Tenn. Crim. App. 1990). Clearly, the discovery of new evidence which calls into question the credibility of a witness at trial is not grounds for post-conviction relief. [Footnote: "The proper method of presenting arguments such as the one raised here is by a writ of error coram nobis. Tennessee Code Annotated section 40-26-105."]
>
> Moreover, the indictments against Agent Howell center around allegations of criminal wrongdoing which occurred in 2001, four years after the incidents which form the bases of the petitioner's convictions, and two years after the petitioner's trial. To accept the petitioner's argument that such a situation requires a new trial would mean that any trial witness who subsequently engages in criminal conduct creates grounds for re-opening long final convictions. We do not believe this to be the law.

The Supreme Court of Tennessee denied Houston permission to appeal on October 4, 2004.

**E.  Houston's Habeas Petition**

On March 15, 2005, Houston filed a pro se petition for a writ of habeas corpus in the district court.  Subsequently, Houston was assigned a federal public defender and filed an amended petition. The Amended Petition claimed a violation of due process under *Brady*, based on the government's withholding of material exculpatory evidence from Houston regarding Howell's cocaine use.

As grounds for his violation of due process argument, Houston argued that the Tennessee Court of Criminal Appeals erred in denying Houston's petition for post-conviction relief, and that it did so "in both its factual findings and legal conclusions."  He claimed the court erred in its factual finding that Howell's cocaine use did not occur until 2001.  He claimed the court erred in its legal finding that "issues concerning . . . the competency or credibility of witnesses, who testified at the trial are not cognizable in post-conviction proceedings."  This holding was legal error, Houston claimed, because the TBI "investigative reports [detailing Howell's cocaine use] were not made until September 2001, nearly three years after Mr. Houston's trial and several months after the denial of his direct appeal on May 7, 2001.  Thus, Mr. Houston had no recourse *but* to raise the issue during his post-conviction appeal."  Houston also claimed that his due process rights were violated because the newly discovered evidence of Howell's cocaine use was "material and exculpatory both as to Mr. Houston's conviction and sentence," and that the prosecution had a constitutional duty to divulge that information pursuant to *Brady*.

The district court granted discovery and expansion of the evidentiary record, and held an evidentiary hearing. Howell testified at the evidentiary hearing. In his testimony, he stated that the "primary reason" he left the TBI in 1998 was because he "got a writing deal, a publishing deal." Howell testified that he began using cocaine around November or December, 1997, but stated he did not use cocaine in 1998, and did not use cocaine again before November 1999, when he returned to the TBI. Howell testified that he did not recall telling anyone outside of the TBI that he used drugs in 1997, 1998, or 1999. He also stated that he did not tell any of the prosecutors with which he worked that he used drugs in 1997, 1998, or 1999. He stated that the first time someone at the TBI was aware of his drug use was when he called Copeland in 2001.

The district court granted a conditional writ of habeas corpus on Houston's *Brady* claim on March 28, 2008. The district court found that "[t]he Tennessee appellate court . . . made findings on the *Brady* claim based upon Petitioner's 'newly discovered evidence' claim about the TBI agent," and held that "the state courts addressed the merits of this contention and even if defaulted, the suppressed evidence is clearly material." The district court found that the information of Howell's drug use was required to be disclosed to Houston under *Brady* because: Howell was a key witness in Houston's case; his use of cocaine impacts his credibility and recollection of events; and, therefore, the information that he was using cocaine "at least during the period of Petitioner's trial is material impeachment evidence that could seriously affect issues as to amounts of cocaine actually purchased." The court found that, although the state-court record reflected that neither the TBI nor the prosecution was aware of Howell's drug use during Houston's trial, the information was required

to be disclosed under *Brady* because "*Brady* extends to exculpatory or impeachment information that

is known by police officers assigned to the prosecution team." The district court continued:

> Howell was involved in the Petitioner's buys that gave rise to his trial. A key witness's use of cocaine impacts the witness's credibility and recollection of events. In that respect, the TBI agent's usage of cocaine at least during the period of Petitioner's trial is material impeachment evidence that could seriously affect issues as to amounts of cocaine actually purchased. This impeachment evidence leads this Court to have a lack of confidence in the verdict giving rise to Petitioner's conviction. Although the Tennessee appellate court found that the TBI agent's criminal charges did not arise until four years after the Petitioner's trial and the evidence tampering occurred two years after Petitioner's trial, the evidence in this Court is that the TBI agent's cocaine use and his tampering with evidence began in 1997 and 1998[. T]hat was prior to and during the same time period as the Petitioner's criminal investigation and trial. The State courts' findings on this issue are unreasonable because those courts lacked a complete review of the lead agent's activities. The timing of the agent's use of cocaine and tampering with evidence is the key, not the date of his conviction.

The Warden timely appealed the grant of the writ on the *Brady* claim and Houston appealed

the denial of the writ based on an ineffective assistance of counsel claim.[4]

## II.

This court reviews the district court's conclusions of law de novo and its factual findings for

clear error. *Lucas v. O'Dea*, 179 F.3d 412, 416 (6th Cir. 1999).

---

[4]The Government moved for a stay of the district court's grant of the writ pending appeal on May 6, 2008. Houston moved for his release pending appeal on May 19, 2008. On July 22, 2008, the district court denied both motions, but allowed Houston to renew his motion if the state court had not retried him within 120 days. On August 26, 2008, after the Warden filed a Notice of Appeal, the district court granted Houston's motion for release because it was concerned that "denial of release pending the appeal will result in the confinement of Petitioner who is confined based upon an unconstitutional conviction."

The district court's opinion focused primarily on whether the evidence of Howell's cocaine use and evidence tampering was subject to disclosure under *Brady*. On appeal to this Court, however, the Warden does not argue that the evidence of Howell's cocaine use was not subject to disclosure under *Brady* at the time of Houston's trial, but rather limits his argument to whether the *Brady* claim is barred by procedural default because it was not presented to the state courts. Houston argues that he did adequately present his *Brady* claim to the state courts through his argument and factual allegations, as well as his citation to relevant federal authority. The district court dispensed with that argument briefly, stating that "as reflected earlier in this Memorandum, the state courts addressed the merits of this contention and even if defaulted, the suppressed evidence here is clearly material."

A habeas petitioner is generally required to exhaust state remedies by presenting the substance of his constitutional claim to the state courts prior to seeking federal habeas relief. 28 U.S.C. § 2254(b)(1)(A)[5]. "The exhaustion-of-state-remedies doctrine, now codified in the federal habeas statute, 28 U.S.C. [§§] 2254(b) and (c), reflects a policy of federal-state comity, an accommodation of our federal system designed to give the State an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Picard v. Connor*, 404 U.S. 270, 275 (1971) (internal footnotes, citations and quotations omitted). Federal courts "have consistently

---

[5]28 U.S.C. 2254(b)(1)(A) states:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears first that–the applicant has exhausted the remedies available in the courts of the States[.]

adhered to this federal policy, for it would be unseemly in our dual system of government for a

federal district court to upset a state court conviction without an opportunity to the state courts to

correct a constitutional violation." *Id.* (internal quotations omitted).

A petitioner's failure to fairly present a claim to the state courts can lead to procedural

default:

> In situations in which a petitioner has failed to fairly present federal claims to the
> state courts, and a state procedural rule now prohibits the state court from considering
> them, the claims are considered procedurally defaulted. While in such situations the
> exhaustion requirement is technically satisfied because there are no longer any state
> remedies available to the petitioner the petitioner's failure to have the federal claims
> considered in the state courts results in a procedural default of those claims that bars
> federal court review.

*Pudelski v. Wilson*, 576 F.3d 595, 605 (6th Cir. 2009) (internal citations omitted).[6] The petitioner

has the burden of proving exhaustion. *Caver v. Straub*, 349 F.3d 340, 345 (6th Cir. 2003).

Once a federal claim has been "fairly presented" at the first possible opportunity within "one

complete round of the State's established appellate review process," the claim has been exhausted.

*Williams v. Bagley*, 380 F.3d 932, 967 (6th Cir. 2004); *Caver*, 349 F.3d at 346.[7] This means,

---

[6]While a petitioner may obtain relief on a claim that is procedurally defaulted by showing
either (1) cause and prejudice, or (2) that failure to adjudicate the defaulted claim would result in a
fundamental miscarriage of justice, Houston does not argue either of those possibilities here. *Schlup
v. Delo*, 513 U.S. 298, 321 (1995); *Murray v. Carrier*, 477 U.S. 478, 489 (1986).

[7]A "complete round" requires a petitioner to also present the issues to the state supreme court.
*O'Sullivan v. Boerckel*, 526 U.S. 838, 845-47 (1999). The record does not contain Houston's
petition to the Tennessee Supreme Court for permission to appeal the denial of post-conviction
relief, but the Warden does not contend that any issues raised in Houston's appeal from denial of
post-conviction relief in the trial court were not also presented to the Tennessee Supreme Court.

broadly, "that the substance of a federal habeas corpus claim must first be presented to the state courts." *Picard*, 404 U.S. at 278. Determining when a claim has been "fairly presented" is contextual and individual to each case. In some instances, simply presenting the facts, without also presenting "the constitutional claim . . . inherent in those facts" is insufficient. *Id.* at 277. In others, however, "the ultimate question for disposition will be the same despite variations in the legal theory or factual allegations urged in its support." *Id*. (internal quotations and citations omitted); *Jells v. Mitchell*, 538 F.3d 478, 504 (6th Cir. 2008) ("To present a claim fairly, it is sufficient if the substance of the claim was presented to the state courts, such that the ultimate question would have been the same despite variations in the legal theory or factual allegations urged in its support."). It is "not enough . . . that a somewhat similar state-law claim was made," *Anderson v. Harless*, 459 U.S. 4, 6 (1982), nor is it sufficient to raise general allegations of the denial of rights to a fair trial and due process because they do not fairly present claims that specific constitutional rights were violated. *McMeans v. Brigano*, 228 F.3d 674, 681 (6th Cir. 2000); *see Katt v. Lafler*, 271 F. App'x 479, 481 (6th Cir. 2008) (finding claim that admission of hearsay "violated the rules of evidence [and] denied [the petitioner's] constitutional rights to due process and a fair trial. US Const, Ams V, VI, XIV" not sufficient for fair presentation). This does not mean, however, that a petitioner need have "recite[d] book and verse on the federal constitution." *Abshear v. Moore*, 354 F. App'x 964, 967 (6th Cir. 2009) (quoting *Newton v. Million*, 349 F.3d 873, 877 (6th Cir. 2003)).

Recognizing that "[a] claim may only be considered 'fairly presented' if the petitioner asserted both the factual and legal basis for his claim to the state courts," in *McMeans*, this Court reiterated that there are

> four actions a defendant can take which are significant to the determination whether a claim has been "fairly presented": (1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law.

*McMeans*, 228 F.3d at 681 (citing *Franklin v. Rose*, 811 F.2d 322, 326 (6th Cir. 1987)).

In *Franklin*, 811 F.2d at 326, this Court quoted *Daye v. Attorney General*, 696 F.2d 186 (2d Cir. 1982) (*en banc*), for the four factors to be considered in assessing whether there has been a fair presentation. In *Daye*, after noting that "[t]he chief purposes of the exhaustion doctrine would be frustrated if the federal habeas court were to rule on a claim whose fundamental legal basis was substantially different from that asserted in state court," the court explained:

> By the same legal "basis" or "doctrine," we do not mean that there can be no substantial difference in the legal theory advanced to explain an alleged deviation from constitutional precepts. For example, constitutional doctrine forbids use of a confession against a defendant unless the confession was voluntary. A number of legal theories may be advanced as to why a confession was not voluntary. Yet all that is needed to alert the state courts to the constitutional nature of the claim is the exposition of the material facts and the assertion that the confession was not voluntary.

*Daye*, 696 F.2d at 192 n.4. The court in *Daye* continued its analysis:

> The more specific the description of the right in question- *e.g.,* assistance of counsel, double jeopardy, self-incrimination-the more easily alerted a court will be to consider a constitutional constraint couched in similarly specific terms. The greatest difficulty arises when in the state court the petitioner has described his claim

in very broad terms, such as denial of a "fair trial." The concept of fairness embraces many concrete notions, ranging from such fundamental matters as the right of the defendant to know the charges against him, to such lesser interests as his right to have each count of the indictment charge him with no more than one criminal violation, or the right to have access to reports by informant witnesses to law enforcement officials, or the right to present information in mitigation of punishment before being sentenced after conviction. Obviously not every event in a criminal proceeding that might be described as "unfair" would be a violation of the defendant's rights under the Constitution. In order to determine, therefore, whether a claim that the defendant has been denied a "fair trial" involves a constitutional claim, one must look to the factual allegations supporting the claim. Some will be of patently constitutional dimension. If the defendant claimed that he was accused of one crime but convicted of an entirely different crime and hence was denied a fair trial, no reasonable jurist would doubt that the defendant's claim implicated his constitutional right to due process of law. In contrast, a defendant's claim that he was deprived of a fair trial because of the admission in evidence of a statement objectionable as hearsay would not put the court on notice that the defendant claimed a violation of his constitutional right to be confronted by his accusers.

*The general principle governing assessment of whether a fair trial claim is of constitutional dimension is that where the claim rests on a factual matrix that is well within the mainstream of due process adjudication, the state courts must be considered to have been fairly alerted to its constitutional nature. If, on the other hand, the claim is based on a fact pattern not theretofore commonly thought to involve constitutional constraints, there is usually little reason to believe the courts were alerted to its supposed constitutional nature.*

*In addition, however, even if a particular matter is not treated generally as having constitutional dimension, if the courts of the state in question have themselves previously treated that fact pattern as appropriate for constitutional analysis, it would be unreasonable to suppose that they are not alert to constitutional considerations. Thus we consider that a defendant who cites state precedent that employs pertinent constitutional analysis has adequately put the state courts on notice of the constitutional thrust of his claim.*

*Daye*, 696 F.2d at 193-94 (internal footnotes, citations, and quotations omitted; emphasis added).

Houston argues that he satisfied the fair presentation requirement through three of the four

*Daye* factors adopted by this Court in *Franklin*: (1) phrasing the claim in terms sufficiently

particular to allege a denial of a specific constitutional right; (2) alleging facts well within the

mainstream of a due process constitutional violation based on *Brady*, which Tennessee state courts

would have recognized based on their prior application of *Brady*; and (3) citing federal authority

addressing *Brady* issues. We will address the first two factors together, and then proceed to the

third.

**A. Phrasing the Claim in Terms Sufficiently Particular to Allege a Denial of a *Brady* Right, and Allegation of Facts Well Within the Mainstream of a Due Process *Brady* Violation.**

In support of the first and second factors, Houston points to a number of statements from his

pro se post-conviction petition to the trial court. However, to be fairly presented any claim would

have to be made to "one complete round of the State's established appellate review process."

*O'Sullivan*, 526 U.S. at 845 (finding claims not presented to state supreme court for discretionary

review are not exhausted); *Baldwin v. Reese*, 541 U.S. 27, 31-32 (2004); *Williams v. Anderson*, 460

F.3d 789, 806 (6th Cir. 2006) (finding claim procedurally defaulted where, although raised in state

appellate court, not raised before state supreme court). Therefore, because the petition to the

Supreme Court of Tennessee is not part of the record, and there is no claim that it differed from the

petition before us, we will review the petition in Houston's first appeal of the denial of post-

conviction relief.

Houston stated in the facts portion of his post-conviction appellate brief:

Since the trial of the petitioner's case, there has been newly discovered evidence that
the lead investigating agent was involved in criminal activity relating to drugs and
evidence tampering. TBI Agent, Patrick Howell, testified that he was under
indictment for possession and several indictments for tampering with the evidence.

Agent Howell's wrong doings did not come to light until September 2001 which was over two years after petitioner's trial. The factual background of Agent Howell's tampering with evidence and drug possession were not known to the petitioner or his counsel at the time of his trial; thus, he was not afforded an opportunity to question Agent Howell with regard to his wrong doings which may have been related to matters involving the petitioner's case.

In his argument premised on newly-discovered evidence, Houston quoted a state court case for the proposition that newly-discovered evidence will support a new trial where "the testimony of the witness who is sought to be impeached was so important to the issue, and the evidence impeaching the witness so strong and convincing, that a different result must necessarily follow." The brief then noted that Howell was the case agent for Houston's case, and argued that "his testimony is absolutely imperative to placing the cocaine in the possession of the petitioner." Later, Houston described the evidence as "newly discovered impeachment evidence," and stated that it was "character evidence which could have been used at trial to question the creditability [*sic*] of the TBI agent."

*Brady* and its progeny in the Supreme Court have phrased the rules regarding the government's obligation to disclose favorable information to defendants in slightly different ways. *See Brady*, 373 U.S. at 87 ("We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."); *Giglio v. United States*, 405 U.S. 150, 153-54 (1972) ("[S]uppression of material evidence justifies a new trial irrespective of the good faith or bad faith of the prosecution. When the reliability of a given witness281

- 19 -

may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within this general rule." (internal citations and quotations omitted)); *United States v. Bagley*, 473 U.S. 667, 676, 682 (1985) ("Impeachment evidence . . . falls within the *Brady* rule. . . . [E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."); *Strickler v. Greene*, 527 U.S. 263, 281-82, 289 (1999) ("There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued. . . . He must convince us that 'there is a reasonable probability' that the result of the trial would have been different if the suppressed documents had been disclosed to the defense.")

Houston did allege facts well within the mainstream of a *Brady* claim, and he phrased his claim in terms sufficiently particular to a *Brady* claim. Houston presented a claim to the Court of Criminal Appeals of Tennessee regarding "impeachment evidence" that was "newly discovered," i.e., undisclosed, regarding a state witness.[8] He explained why the evidence was material and favorable to Houston, and that Howell's centrality to Houston's case was such that he was likely

---

[8]Houston's argument does not explicitly allege withholding of the information by the state. In other circumstances, this might be fatal to his claim. *See Beach v. Moore*, 343 F. App'x 7, 11-12 (6th Cir. 2009) (facts alleged in support of due process involuntary statement claim not within the mainstream of constitutional law because they alleged coercion by petitioner's lawyer, not by police). However, in this case, where the withheld evidence was purportedly known only by the government witness who testified and to whom *Brady* applies directly, there is no question that his failure to divulge this information was a withholding by the government.

prejudiced by the failure to disclose the information such that "a different result must necessarily follow." Houston also made the point that not having the evidence of Howell's cocaine use during trial deprived him of "an opportunity to question Agent Howell with regard to his wrong doings which may have been related to matters involving the petitioner's case." Thus Houston claimed that he was denied the opportunity to cross-examine a crucial government witness, who was also a government agent, regarding the credibility of his testimony because he was unaware at trial of the government agent's wrongdoing, and that because of the centrality of the government agent's testimony, a different result must follow.

Prior decisions of this Court in regard to other constitutional claims indicate that Houston's allegations were sufficiently similar to a *Brady* claim to be well within its constitutional scope. For example, in *Whiting v. Burt*, 395 F.3d 602, 613 (6th Cir. 2005), this Court held that an ineffective assistance of counsel claim premised on a conflict of interest between trial and appellate counsel was fairly presented to the state courts even though "the question of the alleged conflict of interest could certainly have been made in a more specific and more emphatic manner," where Michigan courts were

> demonstrably very knowledgeable of federal law regarding ineffective assistance of counsel and claimed conflicts of interest, were made aware of the fact that Defendant was represented by the same attorney at trial and on appeal and, to the extent that this represented a conflict of interest, it was brought to the attention of the Michigan courts.

*Id.* at 615. Similarly, in *West v. Bell*, 550 F.3d 542 (6th Cir. 2008), this Court found that the facts

alleged in state court in support of a due process prosecutorial misconduct claim "were sufficiently

particular and well within the mainstream of constitutional law" where petitioner had

> specifically stated that the prosecutor's comments . . . were "highly prejudicial and
> improper." . . . Though this statement was not close to an invocation of the Supreme
> Court's standard for judging prosecutorial misconduct, it was evocative of language
> that we articulated in *United States v. Leon*, 534 F.2d 667 (6th Cir. 1976). As we
> stated in *Leon*, we evaluate claims of prosecutorial misconduct using four factors,
> including "whether the remarks tended to mislead the jury or to *prejudice* the
> accused." *Id.* at 679. . . . Indeed, in *Leon*, the court found that the remarks at issue
> were "improper and highly prejudicial," *Leon*, 534 F.2d at 678, the very same phrase
> used by West.

*Id.* at 564; *see also Fulcher v. Motley*, 444 F.3d 791, 798 (6th Cir. 2006) (assertion of facts that a

witness's out-of-court statements were asserted for their truth and that she was unavailable for cross-

examination were well within the mainstream of Confrontation Clause violation); *Jackson v.*

*Edwards*, 404 F.3d 612, 619 (2nd Cir. 2005) (argument is fairly presented "when the substance of

the federal habeas corpus claim is clearly raised and ruled on in state court, although the federal

principle may initially be attached to a different label than the one ultimately affixed in federal

habeas proceedings" (internal citation omitted)).

In *Blankenship v. Estelle*, 545 F.2d 510, 514-15 (5th Cir. 1977), the petitioner brought a due

process habeas claim based on *Giglio v. United States*, 405 U.S. 150 (1972) (finding government's

failure to disclose alleged promise made to prosecution witness that he would not be prosecuted if

he testified violated *Brady*). The Fifth Circuit found the claim fairly presented even though it was

not raised as a *Giglio* claim in state court:

> Concededly, the particular case holding of *Giglio* was not called to the states courts'
> attention. However, the kernel of petitioner's complaint is that he was convicted on
> perjured testimony, knowingly used by the prosecution; or, at the least, that he was
> deprived by the State of impeachment evidence helpful and material to his defense.
> Courts have long been on notice that such a conviction violates due process
> requirements. *Brady v. Maryland*, 373 U.S. 83 [](1963); *Napue v. Illinois*, 360 U.S.
> 264 [] (1959); *Pyle v. Kansas*, 317 U.S. 213 [] (1942); *Mooney v. Holohan*, 294 U.S.
> 103 [] (1935). Petitioner's application in the state court proceedings clearly raised
> this issue; he is not required to cite to the state court "book and verse on the federal
> constitution," *Picard v. Connor*, 404 U.S. 270 [] (1971), in order to adequately
> present his constitutional claim.

*Blankenship*, 545 F.2d at 514-15. The facts Houston presented to the state courts, as well as his

argument regarding the prejudice he incurred as a result of not being informed of Howell's cocaine

use, were sufficient to alert the state courts of the constitutional dimension of his claim.

Further, as Houston notes, Tennessee courts have dealt with multiple *Brady* cases using

similar language to that used in Houston's brief, and thus may be presumed to be familiar with such

claims. *See Daye*, 696 F.2d at 194 ("if the courts of the state in question have themselves previously

treated that fact pattern as appropriate for constitutional analysis, it would be unreasonable to

suppose that they are not alert to constitutional considerations"); *see, e.g., Register v. State*, No.

01C01-9605-CC-00199, 1999 WL 333114, *4 (Tenn. Crim. App. May 26, 1999) (analyzing under

*Brady* where "petitioner claims that the state withheld exculpatory information . . . [and] . . . that he

is entitled to a new trial"); *Eisom v. State*, No. 02C01-9703-CC-00105, 1998 WL 195952, *1 (Tenn.

Crim. App. April 24, 1998) (analyzing under *Brady* where "the petitioner claims . . . that he should

be granted a new trial because the state failed . . . to disclose exculpatory evidence").

Therefore, these two factors support Houston's claim that he fairly presented his *Brady* claim to the state courts.

**B.  Citation of Federal Authority**

Houston also argues that his citation of federal authority in his post-conviction brief to the Tennessee Court of Criminal Appeals supports his argument that the *Brady* claim was fairly presented.  *See Fleming v. Metrish*, 556 F.3d 520, 548 (6th Cir. 2009) (finding claim fairly presented in part based on presentation of federal authority) (Clay, J., dissenting); *West*, 550 F.3d at 564 (same).  For fair presentation purposes, the cited federal authority need not strongly support the federal constitutional claim, as long as it makes clear "the federal law basis for [the] claim." *Gonzales v. Wolfe*, 290 F. App'x 799, 811 (6th Cir. 2008); *cf. Beach v. Moore*, 343 F. App'x 7, *11 (6th Cir. 2009) (where petitioner relied on four federal cases that discussed federal evidentiary rule, but "[n]othing in the text of the rule refers to any constitutional right . . . [n]or do the cases interpreting it employ any federal constitutional analysis," citations did not support argument that constitutional claim was fairly presented).

In his post-conviction appellate brief, Houston cited "*Cagle v. Davis*, 520 [F]. Supp. 297, 309 (E.D. Tenn. 1980), aff'd 663 F.2d 1070 (6th Cir. 1981)" for the proposition that "when the verdict is already one of questionable validity, newly discovered evidence of relatively minor importance may be sufficient to create the probability of acquittal."  *Cagle* was a decision on a habeas petition summarily dismissing two grounds for relief and discussing at length the third claim asserting a "deni[al] of federal due process of law when the state of Tennessee suppressed evidence favorable

to [petitioner] which had materiality on the issue of his guilt or innocence." *Cagle*, 520 F.Supp. at 300. The court found that evidence that would have reflected on the reliability of a trial witness was "directly material to [petitioner's] guilt or innocence." *Id.* at 308. The *Cagle* court noted that it was conducting its analysis "on the bases that [the government] received no general request for exculpatory material from [petitioner] within the meaning of *Brady v. State of Maryland* (1963), 373 U.S. 83." *Id.* at 303. *Cagle* also relied on *United States v. Agurs*, 427 U.S. 97 (1976), which addressed whether certain background information about a victim had to be supplied under *Brady*. The Court granted the writ.

Although Houston did not assert a *Brady* claim based on *Cagle* in so many words, *Cagle* is directly relevant to a *Brady* claim, and discussed the requirements of *Brady* as well as the standard for determining prejudice. This factor also supports a finding that Houston fairly presented his *Brady* claim to the state courts.

### III.

At the evidentiary hearing on his post-conviction motion, Houston sought to establish, through questioning Howell regarding the TBI reports and summaries, that Howell was involved with cocaine at the time he was investigating Houston and at the time he testified at Houston's trial. Howell denied this, and the circuit court accepted Howell's testimony, concluding that:

> Based on the testimony of Patrick Howell, and the reports filed by the Tennessee Bureau of Investigation, the Court finds that Patrick Howell neither used cocaine, nor tampered with evidence prior to the trial of the Petitioner.

We agree with the district court that this factual finding resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.[9] The TBI reports clearly support that Howell was using cocaine well before Houston's trial.[10] That the Tennessee courts made factual findings that led them to miss the *Brady* issue does

---

[9]Ordinarily, under the AEDPA, federal courts may not grant habeas relief for claims adjudicated on their merits in a state court proceeding unless the state court proceeding:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.

28 U.S.C. § 2254(d).

Apparently referring to the AEDPA, the district court found both that the factual finding that Howell did not use drugs until after the trial was an unreasonable determination of the facts in light of the evidence presented in state court and that the court "lacked a complete review of the lead agent's activities. The timing of the agent's use of cocaine and tampering with evidence is the key, not the date of his conviction." Respondent makes much of this "lacked a complete review" language. It is unclear whether the court was saying that the lack of a full record led to the unreasonable conclusion or that the court's decision lacked a complete review of Howell's activities. The district court conducted an evidentiary hearing at which Howell provided more testimony. However, the impeaching information that supported a conclusion that Howell was involved with cocaine at the time of trial was before the Tennessee courts. Therefore, the Tennessee courts' finding was unreasonable based on the information before it, and appeared even more unreasonable in light of the testimony before the district court.

Thus, even if Houston's *Brady* claim was adjudicated on its merits, the claim would survive AEDPA deference because it resulted in a decision that was based on an unreasonable determination of the facts regarding when Howell's drug use began.

[10]As the district court observed, the TBI report, which was before the state courts, stated:

Reverse Operation in 1997 and 2000

not negate that the issue was fairly presented. Had the courts found that Howell was involved in the

relevant activities at the time of trial, the import of his failure to disclose this involvement would

have been apparent.

**IV**

Thus, Houston's *Brady* claim was fairly presented to the Tennessee state courts, and we

**AFFIRM** the district court's grant of habeas on this claim. Because we affirm the district court's

grant of habeas on this basis, we do not address Houston's cross-appeal arguing that he is entitled

to habeas relief due to ineffective assistance of counsel.

---

SA Howell indicated that he did take an amount of cocaine from a kilogram of cocaine he had checked out from the TBI Crime Laboratory in either 1997 or 1998. Laboratory records indicate that SA Howell checked out kilograms of cocaine for reverse operations on September 4, 1997; September 15, 1997; and on September 29, 2000.
. . . .
[] This investigation revealed that SA Howell had been a user of cocaine off and on for a period of time beginning in 1997 until present. He had supplied his cocaine habit by tampering with and stealing cocaine from purchases made while working as a law enforcement officer. He had also tampered and taken cocaine from drug evidence designated to be used in reverse operations. This theft and tampering with evidence occurred in several cases beginning in 1998 through [] September 15, 2001.